*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BEVERLY J. SUMPTER, | ) | |
| | ) | Supreme Court No. S-17589 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 18-017 |
| | ) | |
| FAIRBANKS NORTH STAR | ) | O P I N I O N |
| BOROUGH SCHOOL DISTRICT, | ) | |
| | ) | No. 7549 – August 20, 2021 |
| Appellee. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: James M. Hackett, Fairbanks, for Appellant. Wendy M. Dau, Assistant Borough Attorney, and Jill S. Dolan, Borough Attorney, Fairbanks, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

BORGHESAN, Justice.

## I. INTRODUCTION

A school aide reported an injury to her cervical spine after she repositioned a disabled student in his wheelchair. The aide had significant preexisting cervical spine problems. Doctors disagreed about whether the incident she described could have aggravated these problems and if so for how long. The Alaska Workers' Compensation

Board decided that her work was not the substantial cause of her ongoing disability and need for medical care, and the Alaska Workers' Compensation Appeals Commission affirmed the Board's decision. The aide appeals, contending that the Board and Commission applied incorrect legal standards and that the Board failed to make findings about material and contested issues. We affirm the Commission's decision.

## II.    FACTS AND PROCEEDINGS

### A.    Sumpter's Preexisting Condition

Beverly Sumpter began working for the Fairbanks North Star Borough School District as an intensive resource teacher aide in early November 2013. The job description stated that the position required "proper lifting skills in order to safely lift a minimum of 50 pounds regularly." The District did not evaluate Sumpter's physical capacities prior to hiring her, although it did provide a state-required medical screening examination about two weeks after she was hired. The examination determined that Sumpter had no condition "harmful to the welfare of pupils or school personnel." Sumpter disclosed at this evaluation that she had undergone surgery on her cervical spine in September 2011.

Sumpter had a history of cervical spine problems before she began working for the District. She was involved in a motor vehicle collision around 1998. Medical records related to the accident are not in the record, but at least one doctor involved in this case considered the accident a significant reason for her ongoing cervical spine problems. By 2007 Sumpter began to receive medical treatment for neck pain and tingling in her right arm. After a few years of conservative care, Sumpter underwent a cervical decompression and fusion at three levels in 2011 when she began to have difficulties using her arms. Medical records preceding the surgery showed significant narrowing of the space available for her spinal cord in part of her neck.

Sumpter evidently recovered well from the surgery and returned to her household duties. She worked for a few months in the summer of 2013 as an aide to an older woman, who hired Sumpter directly. Sumpter's duties included lifting the client "from the bed to the wheelchair, and from the shower back to the wheelchair and back to the bed." Sumpter estimated that the client weighed about 90 pounds but was able to assist in these transfers.

**B.      Sumpter's Injury, Subsequent Treatment, And Medical Evaluations**

Not long after Sumpter's job as the elderly woman's aide ended, the District hired Sumpter to care for a quadriplegic fifth-grade student who weighed about 70 pounds. In Sumpter's words, she did "everything" for the child. Sumpter was part of a two-person lift at least twice every day, when the student was transferred from his home wheelchair to his school wheelchair or needed to be transferred in the nurse's office. Otherwise Sumpter positioned the student by herself. Sumpter — who admitted being "a bad historian" — reported she began to experience neck pain on December 18, 2013[1] after she "scooted" the child, using his belt loops, in his wheelchair. She said that "scooting" the child involved lifting him a little.

The amount and quality of pain Sumpter experienced at the time of the reported injury were disputed because of inconsistencies between medical records and lay witness testimony. Sumpter testified that she felt a momentary or transitory stab of pain at the time she moved the child, something like an electric shock. Her husband corroborated this testimony. Yet the chart notes from Dr. Grayson Westfall, the first doctor Sumpter consulted specifically for the injury, indicated the pain began after work, and another doctor's notes described a headache after school followed by soreness in the

---

[1]      The injury date was first reported as December 19, but ultimately Sumpter said it was December 18.

neck. In early January Sumpter reported to a different healthcare provider that the pain "began instantly" and "spread down her neck on both sides."

Sumpter worked for two days following the "scooting" incident but did only administrative work. December 20, the last day she worked, was the last day of school before winter break. Sumpter recalled having a headache and soreness, but chart notes from a physician assistant whom Sumpter saw on December 23 for other health concerns did not mention any pain complaints. The physician assistant recorded no problems on Sumpter's physical exam.

On December 24 Sumpter awoke in severe pain and had problems getting out of bed. She was unable to cook for Christmas and said that even eating was difficult that day. Jan DeNapoli, a physician assistant who served as Sumpter's healthcare provider for her neck problems, was on vacation at the time, so on December 27 she went to Tanana Valley Clinic First Care for pain and saw Dr. Westfall. Dr. Westfall referred Sumpter to occupational medicine in part to determine whether her problems were work related. He also ordered x-rays and referred her to physical therapy for six weeks.

Sumpter followed up with Dr. Matthew Raymond in occupational medicine. Sumpter complained of neck pain and headache, starting after school on December 19. The chart note indicated that Sumpter had medication "at home for neck pain." Dr. Raymond wrote in the assessment section of his notes that Sumpter's "chronic neck condition" and her previous spinal fusion were "a concern for this particular job" because of the weight she was required to lift. He wrote that "this job exceeds her baseline functional capacity with her neck fusion" and observed that even though Sumpter had been working for the District for less than two months, she was "already having problems," predicting that "[c]ertainly there will be future exacerbations of the

neck pain." He concluded, however, "This is not a work-related injury, but an exacerbation of a pre-existing condition."

Sumpter saw DeNapoli in early January 2014. Sumpter told DeNapoli she began having neck pain after lifting the student and described the pain as "very similar to the pain she had before surgery except that she has no upper extremity symptoms." DeNapoli's physical examination showed that Sumpter had movement restrictions and muscle spasms in her neck, which were worse on the right side. Sumpter wanted to see if her condition would improve with conservative treatment before getting an MRI, so DeNapoli referred Sumpter to physical therapy. Sumpter was to follow up with DeNapoli if her condition did not improve or got worse.

Sumpter underwent physical therapy and chiropractic treatment throughout January 2014. On January 30 the chiropractor recorded that Sumpter was feeling better, and he completed a "fitness for duty" form for the District, indicating Sumpter could frequently lift 11-20 pounds but could only occasionally engage in bending, pushing, pulling, and kneeling. The January 30 visit was Sumpter's last medical care related to her neck for more than eight months; this gap in treatment is unexplained in the record.

In September 2014 Sumpter began seeing Dr. Milton Wright. Dr. Wright's notes reflected that she had multiple musculoskeletal complaints, including back and neck pain, which he treated with osteopathic manipulative therapy and medication. Sumpter returned briefly to the chiropractor but did not continue chiropractic care.

The District set up an employer's medical evaluation (EME) with Dr. Charles Brooks, an orthopedic surgeon, in December 2014. Dr. Brooks diagnosed multiple conditions, including chronic headache beginning in 2007, degenerative disc disease and degenerative arthritis, pain in multiple locations, depression, and anxiety. In Dr. Brooks's opinion, "there probably was no injury" in December 2013, but "[m]ultiple causes contributed to Ms. Sumpter's perceived need for treatment and the

claimed disability." After noting that Sumpter had "a higher than average propensity to consume healthcare services," Dr. Brooks wrote that even though there was a "two year gap in records between December 22, 2011, and December 27, 2013," Sumpter "[a]lmost certainly . . . continued to receive intermittent treatment during this time." Dr. Brooks pointed to Dr. Raymond's chart note that Sumpter had medication for neck pain at home to support this conclusion.

Dr. Brooks's opinion that Sumpter "remained at least intermittently symptomatic" after her 2011 surgery was supported by "the fact that the degenerative and stenotic changes in her cervical spine remaining postoperatively did not improve, but inevitably gradually worsened during this time," with the fusion placing increased stress on adjacent vertebrae and accelerating degeneration. Dr. Brooks identified the following causes as contributing to Sumpter's need for treatment: "residuals" of her neck injury sustained in the 1998 car accident, degenerative disc disease, degenerative arthritis of her cervical spine, "acceleration of the degeneration due to chronic smoking and the three level cervical fusion," sleep position, "avocational and occupational activities," and "psychological problems."

In giving an opinion about the relative importance of different causes, Dr. Brooks separately discussed several conditions. He indicated it was unclear what type of headaches Sumpter suffered from, but he considered the headaches she complained of after December 2013 to be essentially the same type of headache, with the same cause, as the headaches reported from 2007 onward. He thought Sumpter's neck pain was related to her degenerative arthritis and disc disease, but that depression and anxiety played a role as well.

Dr. Brooks thought Sumpter's upper back pain was referred from her cervical spine and that her shoulder pain could either be referred pain or pain from

"intrinsic shoulder pathology."[2] Finally, Dr. Brooks said that Sumpter's medical records showed other episodes similar to the reported sequence of events in December, when Sumpter awoke in pain and then sought medical care. He concluded that the substantial cause of disability "and/or" the need for medical care was Sumpter's "preexisting, ongoing, and inevitably gradually worsening degenerative and stenotic pathology in her cervical spine."

Dr. Brooks agreed with Dr. Raymond that Sumpter's neck pain was likely not the result of a work injury because she first noticed the pain at home. Dr. Brooks went into considerable detail about inconsistencies in the chart notes of different providers about how the injury happened and when Sumpter first felt pain. He discussed the possibility of secondary gain and thought Sumpter showed what he called "opportunistic misattribution."

When the District asked Dr. Brooks whether Sumpter could continue to work as an aide, he responded that she could not and elaborated that she "should never have been hired for this job since it exceeds her physical capabilities." Dr. Brooks agreed with Dr. Raymond's opinion that Sumpter could " 'expect to have these [exacerbations] with any strenuous activity at home or work.' " (Alteration in original.) He noted that Sumpter's assessment of her own capabilities "contradict[ed]" his and Dr. Raymond's professional opinions, with Sumpter contending that she was "pain free and strong" before the December "scooting" incident.

In December 2014 Sumpter went to see Dr. Kim Wright, a neurosurgeon, about her neck pain. Sumpter said her symptoms were worse then than they had been in January, when she saw DeNapoli. Dr. Wright said Sumpter "obviously [had] suffered at least a cervical strain injury," but because of her increased symptoms, he thought she

---

[2] Sumpter had shoulder surgery in late 2011, after her neck surgery.

should have some imaging. X-rays and an MRI were obtained, with the MRI showing neural foraminal narrowing at the levels above and below the fusion site.

The next month Sumpter saw Dr. Paul Jensen, another neurosurgeon; he referred her for a nerve root block. After the block Sumpter reported reduced pain in her right arm. Sumpter continued to get osteopathic manipulative therapy from Dr. Milton Wright. By June 2015 Dr. Jensen was recommending another surgery.

Sumpter underwent a second independent medical evaluation (SIME) with Dr. Jon Scarpino, an orthopedic surgeon with experience treating and training athletes, in July 2017. Dr. Scarpino reviewed records and provided an extensive medical summary. Dr. Scarpino diagnosed multiple conditions, including chronic pain syndrome, deconditioning, degenerative disc disease in all areas of the spine, stenosis in the cervical spine, and a "[r]eported onset of cervical pain" on December 19, 2013.

Dr. Scarpino discussed the different reports of the injury and agreed with Drs. Raymond and Brooks that whatever prompted the onset of Sumpter's pain, it was not a work-related accident. Unlike Drs. Raymond and Brooks, however, Dr. Scarpino did not think Sumpter was precluded from heavy work because of her cervical fusion. While Dr. Scarpino did not think work was the reason Sumpter had pain complaints, he stated she had "a reason for the neck pain," which was continuing disc degeneration.

Dr. Scarpino thought Sumpter had suffered, at most, a muscle strain in her upper back in December 2013, which may have caused neck pain. But he thought such an injury would have resolved within six weeks with treatment. He did not think this injury would have combined with Sumpter's preexisting cervical condition to cause any disability or ongoing need for medical care; he attributed her persistent symptoms to "her pre-existing condition." He identified Sumpter's "cervical degenerative disc disease" as the substantial cause of her disability and need for treatment. While Dr. Scarpino thought Sumpter might benefit from treatment, he did not think any further medical care

was needed related to the work-related injury. Dr. Scarpino rated Sumpter for a permanent partial impairment rating, but he did not think the impairment was work related.

One of the questions posed to Dr. Scarpino was whether "repeated lifting, or repeated repositioning" of a student like the one Sumpter cared for could "cause cervical injury, including persistent cervical pain." Dr. Scarpino said that "the position described would, at most, produce a strain/sprain type of injury to the upper back musculature and posterior erector chain of muscles." Dr. Scarpino thought it was possible to eliminate the "described mechanism of injury" as having caused a cervical injury with persistent and ongoing pain. He added: "The assertion that [Sumpter] sustained a cervical injury and pain after repetitive lifting or repositioning of a seated 70-pound student does not correlate with the facts in evidence or the mechanical stresses developed by such activity."

## C.    Preliminary Proceedings Before The Board

Sumpter voluntarily resigned her position in January 2014, around the same time that a report of injury was filed with the Board. The District paid Sumpter temporary total disability for about eight weeks, but later claimed it had overpaid Sumpter because her chiropractor had released her to regular work on January 30.

Sumpter, representing herself, filed a written claim for a number of benefits in October 2014. She described the injury mechanism as "re-adjusting a student in his wheelchair by standing in front of him, lifting him by his belt loops," with a single injury date. Her claim stated she had "preexisting injuries" to her neck and reinjured or aggravated it. The District filed a notice of controversion, controverting all benefits and relying on Dr. Brooks's EME report. An attorney entered an appearance for Sumpter in late June 2015.

The Board proceedings were lengthy, so we summarize only portions relevant to issues on appeal. Sumpter posed two questions to Dr. Scarpino about repetitive lifting. The District filed a written objection to these questions, asserting that they were "misleading and mischaracterized the evidence" because Sumpter identified only a single incident as the cause of her injury. It relied on Sumpter's report of injury, the written workers' compensation claim she filed, and a statement she made at deposition to support the objection. The District did not ask for a hearing on the objection,[3] and the Board sent the questions to Dr. Scarpino, who answered them.

Sumpter successfully pursued an occupational disability claim with the State Public Employees' Retirement System while her workers' compensation claim was pending. She submitted to the Board doctors' statements supporting her occupational disability claim.

### D. Hearing Before The Board

The Board held a hearing on Sumpter's claim on June 21, 2018. Six witnesses testified: Sumpter, her husband Patrick, and her sister were lay witnesses; Dr. Raymond, Dr. Brooks, and DeNapoli were the medical witnesses. The Board had the deposition testimony of Dr. Scarpino and Dr. Westfall as well as depositions of both Sumpter and Dr. Raymond. Because of the issues Sumpter raises on appeal, we provide a detailed summary of Dr. Scarpino's testimony.

Dr. Scarpino was deposed before the hearing and also answered interrogatories. Responding to an interrogatory, Dr. Scarpino disagreed with Dr.

---

[3] A regulation in effect at the time of Sumpter's injury provided that a party who objected to an SIME question "shall file a petition" to preserve an objection but also provided that failure to file one did not waive the objecting party's right to have the Board consider the objection at hearing or to have a separate hearing on the objection. Former 8 Alaska Administrative Code (AAC) 45.092(h)(5), am. May 12, 2019.

Raymond's opinion that Sumpter's job with the District exceeded her lifting capacity following the 2011 surgery. Dr. Scarpino acknowledged that doctors "do not usually advise patients to go back to very strenuous activities that put high forces on their neck following cervical fusions," explaining later that engaging in such activities "put[s] more stresses on the adjacent discs" thereby risking accelerated degeneration. Yet he did not consider Sumpter "to be at higher risk than someone without a fusion in relation to intermittent shifting or lifting type maneuvers." Dr. Scarpino said Sumpter had not "report[ed] any previous pain or injuries with the activities carried out."

When presented with the job description for Sumpter's condition, Dr. Scarpino protested that it was "very vague" because the range of motion in which the person would be "lifting 50 pounds" is not specified. He thought different ranges of motion — e.g., from the ground to waist height as opposed to lifting overhead — would have different effects on the neck, making it hard to know whether the activity in the job description would actually affect Sumpter. He said that for some ranges of motion he "would send [a] patient for a job-specific [functional capacities evaluation]."

Dr. Scarpino said the medical literature was "mixed" as to whether "repetitive lifting maneuvers over a period of time cause asymptomatic [degenerative disc disease] to become symptomatic." He thought it was important to consider which part of the spine was engaged in the movement because not all lifting uses neck muscles, and thus does not increase pressure on cervical discs. He thought that the lifting "like we have in this case, of a few inches, is not going to put any stress on the neck" because "the forces stop at the shoulder girdle." He agreed he had not observed the exact maneuver Sumpter made when she "scooted" the student, but he did not think that mattered because in his view the movement did not "go to her neck."

When asked whether he was "discounting the possibility that number of movement [sic] such as that, over time, . . . as a cumulative matter" could cause the

injury, Dr. Scarpino answered, "We're not talking about cumulative maneuvers here. We're talking about one maneuver." He said Sumpter discussed only one incident, and "[t]his one specific incident did not cause any problems with her adjacent level disc disease." When asked whether it was possible "that this one incident, in the context of having worked with this student over a . . . course of a couple [of] months, was the straw that broke the camel's back," Dr. Scarpino said no because he did not think the type of movement at issue would "influence her neck."

Dr. Scarpino said he could not explain why Sumpter had severe neck pain on December 24, 2013, but he did not think the increased pain was related to her work. He also said that in his experience, patients who complained of neck pain after lifting at work had injured their upper back muscles. He said Sumpter was "destined to have symptoms sooner or later," but he did not think the "scooting" incident caused her ongoing symptoms.

DeNapoli opined that the work injury was the main cause of Sumpter's ongoing problems, saying Sumpter would have been "fine" had she not worked for the District. She agreed that Sumpter's preexisting cervical condition was a factor in her ongoing medical problems. DeNapoli was doubtful that Sumpter had the physical capacities to perform the aide job, although she acknowledged that neither she nor Dr. Jensen had placed absolute limits on Sumpter when she ended her treatment with them after the surgery. DeNapoli thought the District should have required some sort of functional capacities evaluation to be sure that Sumpter could in fact lift the required amount on a daily basis.

Sumpter's husband and sister testified about their observations of Sumpter, describing her as fully recovered from the fusion surgery and able to engage in activities like working on the deck of her house and doing all the housework. They both described changes they observed after the December "scooting" incident. Sumpter's husband

confirmed that Sumpter called him on December 18 and that she described an "electric shock" pain when moving the student.

Sumpter introduced her pharmacy records to show that she had not been prescribed pain medication for neck pain prior to the December 2013 incident but had been prescribed medication after a different surgery. The records also addressed the implication in both the EME and SIME reports that Sumpter must have been suffering from neck pain before the "scooting" incident because of references to prescriptions for pain medication in chart notes. Sumpter described in detail the job she had with the District. She testified she felt a sharp but fleeting pain when she "scooted" the child to reposition him and that afterwards she felt a little sore but did not initially think much about it.

Dr. Raymond testified about the type of medical exam Sumpter was required to undergo for the District because he had done them in the past. He indicated that the exam is not a fit-for-duty exam. Instead, the exam's emphasis is on safety to students and other school personnel. Dr. Raymond testified about his December 2013 appointment with Sumpter, mainly relying on the chart note. Dr. Raymond said it was possible that Sumpter hurt her neck when she was positioning the student as she described, but he concluded the injury was likely not work-related because she reported experiencing pain after getting home. He indicated that Sumpter would have felt immediate pain and reported the pain to him if the lift caused an injury severe enough to result in long-term pain.

Dr. Brooks testified consistently with his report and indicated his agreement with Dr. Scarpino. Dr. Brooks said he could not "rule out the fact . . . or the possibility that Ms. Sumpter could have had an exacerbation, i.e., a temporary recurrence of her chronic intermittent neck pain" after the "scooting" incident, but Dr. Brooks said the described mechanism was "not likely to cause a neck injury," adding that "not every

symptom equals an injury." He discussed the issue of increased stresses on and degeneration of adjacent levels of the spine after a fusion surgery, which he identified as the cause of her ongoing symptoms.

### E. The Board's Decision

The Board decided that Sumpter had not proved that her work with the District was the substantial cause of her disability or need for medical treatment. The Board extensively summarized the witnesses' testimony and the parties' arguments. In its analysis, the Board began by addressing some procedural issues and overruled the District's objections to the SIME questions about repeated lifting. It ruled that Sumpter triggered the presumption that her disability and need for treatment were compensable through her own testimony, DeNapoli's testimony, and the written statement from Dr. Jensen. The Board then decided the District rebutted the presumption through the testimony of Dr. Raymond, Dr. Brooks, and Dr. Scarpino "that any work injury was a sprain or strain and would have resolved quickly" and that Sumpter's "current need for treatment" was caused by her preexisting degenerative disc disease.

When weighing the evidence, the Board gave the most weight to Dr. Scarpino's report because he was "independent of both parties." The Board also gave more weight to Dr. Brooks and Dr. Scarpino because "they did a thorough records review," emphasizing that it was important that "Drs. Brooks and Scarpino agree with each other." The Board also stated Drs. Brooks and Scarpino "weighed all the potential causes" when they opined that Sumpter's preexisting degenerative disc disease and fusion surgery were the substantial cause of her continuing pain complaints.

The Board gave less weight to DeNapoli's testimony because "she did not do a records review, and specifically did not review the records immediately after the work injury before she gave her opinion on causation." It also discounted DeNapoli's opinion because it was "based on the fact that [Sumpter's] symptoms are similar to her

pre-fusion status" even though "those original symptoms occurred without a trauma." The Board gave less weight to the opinions of two doctors who had supported Sumpter's occupational disability case, Dr. Jensen and Dr. Wright, in part because these doctors did not weigh all potential causes when forming an opinion about causation. The Board decided that in comparison to all other causes, Sumpter's "pre-existing degeneration and cervical fusion is the substantial cause" of her disability and need for medical treatment and denied Sumpter's claim. Sumpter moved for reconsideration or modification; the Board granted modification in part on two minor factual errors but denied reconsideration.

### F.     Appeal To The Commission

Sumpter appealed to the Commission, which affirmed the Board's decision. After a lengthy summary of the facts, the Commission rejected various challenges to Dr. Scarpino's opinion, to the Board's decision not to give weight to the occupational disability decision, and to the Board's credibility determinations. The Commission decided that the Board correctly determined that the District had rebutted the presumption with the opinions of Drs. Scarpino, Raymond, and Brooks. And it concluded that substantial evidence supported the Board's decision to deny benefits. Acknowledging the conflicting medical opinions before the Board, the Commission ruled that it was the Board's "prerogative" to give most weight to the opinions of Drs. Brooks and Scarpino that the December 2013 incident was not the substantial cause of Sumpter's disability.

Sumpter appeals.

## III.  STANDARD OF REVIEW

"In an appeal from the Alaska Workers' Compensation Appeals Commission, we review the Commission's decision."[4]  We review de novo the Commission's legal conclusion that substantial evidence supports the Board's factual findings by "independently reviewing the record and the Board's findings."[5] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[6]  "Whether the quantum of evidence is substantial is a question of law."[7]  "Whether the [B]oard made sufficient findings is a question of law that we review de novo."[8]

## IV.  DISCUSSION

### A.  The Commission Correctly Concluded That The District Rebutted The Presumption That Sumpter Is Entitled To Compensation.

The Alaska Workers Compensation Act creates a three-step process for determining whether an injured employee is entitled to compensation for disability or medical treatment.[9]  First, the employee must establish a presumption of compensability by "establish[ing] a causal link" between her employment and her disability or need for

---

[4]    *Burke v. Raven Elec., Inc.*, 420 P.3d 1196, 1202 (Alaska 2018).

[5]    *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014) (citing *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010)).

[6]    *Id.* at 1179 (quoting *DeYonge v. NANA/Marriott*, 1 P.3d 90, 92 (Alaska 2000)).

[7]    *Id.*

[8]    *Pietro v. Unocal Corp.*, 233 P.3d 604, 611 (Alaska 2010) (alteration in original) (quoting *Leigh v. Seekins Ford*, 136 P.3d 214, 216 (Alaska 2006)).

[9]    AS 23.30.010(a).

medical treatment.[10]  Second, if the presumption attaches, the employer may rebut the presumption "by a demonstration of substantial evidence" that the disability or need for treatment "did not arise out of and in the course of the employment."[11]  Third, if the employer rebuts the presumption, the Board must then determine whether "the employment is the substantial cause" of the disability or need for treatment,[12] "choos[ing] among the identified causes the most important or material cause with respect to the benefit sought."[13]

In this case, the Board determined at the second step that the District rebutted the presumption with three doctors' opinions "that any work injury was a sprain or strain and would have resolved quickly."  The Board also mentioned Dr. Scarpino's opinion that adjusting the student would not have put forces on Sumpter's neck.  The Commission affirmed, considering these doctors' opinions adequate to rebut the presumption.

Sumpter argues that the Commission erred in affirming the Board's decision, contending that the medical opinions proffered by the District were "insufficient" to rebut the presumption of compensability.  She suggests that the Board should have compared the District's evidence against her own in deciding whether the District's evidence was substantial enough to rebut the presumption.

We disagree.  As the District argues, we have consistently held that at the first and second stages of the workers' compensation presumption analysis, the evidence

---

[10]     *Id.*

[11]     *Id.*

[12]     *Id*.

[13]     *Morrison v. Alaska Interstate Constr. Inc.*, 440 P.3d 224, 238 (Alaska 2019).

is not weighed and is viewed in isolation.[14] Sumpter points out that we have stated, in determining whether evidence is substantial, that we "must take into account whatever in the record fairly detracts from its weight."[15] But in those cases we applied the substantial evidence rule to review an administrative agency's factual findings.[16] Because making factual findings entails weighing conflicting evidence, it makes sense that substantial evidence review in that context considers the weight of detracting evidence. But this rule does not neatly map onto the Board's task at the second stage of the rebuttable presumption analysis, when the Board is not making factual findings. Instead, the Board at the second stage is deciding only whether the employer has rebutted the presumption of compensability with evidence that the injury was not caused by

---

[14] *See McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 620 (Alaska 2011) (citing *Stephens v. ITT/Felec Servs.*, 915 P.2d 620, 624 (Alaska 1996)). The rule that the evidence is viewed in isolation is similar to the way we decide whether a genuine issue of material fact precludes summary judgment: the evidence presented at summary judgment does not need to meet "the applicable evidentiary standard" and is viewed making all inferences in favor of the nonmoving party. *See Christensen v Alaska Sales & Serv. Inc.*, 335 P.3d 514, 519 (Alaska 2014).

[15] *Lopez v. Adm'r, Pub. Emps.' Ret. Sys.*, 20 P.3d 568, 570 (Alaska 2001); *accord Alaska Police Standards Council v. Maxwell*, 465 P.3d 467, 473 (Alaska 2020) (Although substantial evidence is "a deferential standard, we will review the entire record to ensure that the evidence detracting from the agency's decision is not dramatically disproportionate to the evidence supporting it such that we cannot conscientiously find the evidence supporting the decision to be substantial.").

[16] *Lopez*, 20 P.3d at 571-73 (holding that Public Employee Retirement Board's finding that claimant's disability was unrelated to her work was supported by substantial evidence); *Maxwell*, 465 P.3d at 474 (reversing Alaska Police Standards Council's finding that officer lacked good moral character for lack of substantial evidence).

employment.[17] That evidence must be "comprehensive and reliable," but it is considered "standing alone."[18] The Board's task is to consider whether "a reasonable mind" could reach the conclusion that the injury is not compensable if that reasonable mind credited the evidence.[19] Therefore it was not required to weigh the District's evidence against Sumpter's when deciding whether the former was substantial at the second step of the analysis.

Sumpter also argues that the Board's second stage analysis was flawed because the Board "relied on insufficient medical opinions." She contends that the medical opinions needed to "rul[e] out work-related causes" of her disability in order to rebut the presumption. Relying largely on *Huit v. Ashwater Burns, Inc.*,[20] she asserts that the doctors' opinions were too speculative, and were thus not substantial evidence, because they were unable to identify the cause of her increased pain in late December 2013. In her reply brief she asserts that the Board needed to consider her repetitive lifting of the student as a competing cause of her disability.

We reject Sumpter's contention that the Board erred by not considering repetitive lifting as a competing cause of her disability at the second stage. She waived consideration of this point by raising it for the first time in her reply brief,[21] but in any

---

[17]     AS 23.30.010(a).

[18]     *Carlson v. Doyon Universal-Ogden Servs.*, 995 P.2d 224, 228-29 (Alaska 2000).

[19]     *See Cowen v. Wal-Mart*, 93 P.3d 420, 426 (Alaska 2004) (explaining that a reasonable mind could rely on medical opinion to decide that medical problem was not caused by work injury and that this opinion rebutted the presumption).

[20]     372 P.3d 904 (Alaska 2016).

[21]     *See Barnett v. Barnett*, 238 P.3d 594, 603 (Alaska 2010).

event repetitive lifting at work is an alternative injury theory, i.e., a different way that work would cause Sumpter's disability. Sumpter needed to file a claim based on that injury theory in order for the Board to consider it.[22] And as we discuss in more detail below, Sumpter did not squarely present this alternative injury theory to the Board, so the Board was not obliged to address it.

We also reject Sumpter's argument that the medical opinions relied on by the Board were inadequate.[23] Sumpter's argument stems from changes the legislature made to the presumption of compensability in 2005. Before 2005, an employee had to show that work was "a substantial factor in causing the disability" to receive compensation.[24] The legislature then changed the law to provide that an employee must prove that work is "the substantial cause of the disability."[25] With these amendments, the legislature also required the Board to "evaluate the relative contribution of different causes of the disability" in deciding whether employment is the substantial cause.[26] We analyzed these amendments in *Huit*, but because the claimant in that case did not have a preexisting condition that might be a competing cause of his injury, we did not decide

---

[22]    *See Groom v. State, Dep't of Transp.*, 169 P.3d 626, 628-31 (Alaska 2007) (detailing differences in workers' compensation claims that alleged different injury theories).

[23]    Sumpter's attacks on the opinions of the doctors the Board relied on tend to conflate the second and third steps of the presumption analysis. Because many of her attacks against these opinions entail weighing them against each other and other evidence in the record, we address all of those criticisms in deciding at the third stage whether the Board's decision is supported by substantial evidence.

[24]    *Huit*, 372 P.3d at 907.

[25]    *Id.* at 908 (quoting AS 23.30.010(a)).

[26]    *Id.* at 907.

whether these amendments altered the standards for evaluating the employer's evidence at the second step of the presumption analysis.[27] However, we did observe that "something cannot be 'the substantial cause' of a disability if it is not a cause at all."[28] In other words, if an employer's evidence is sufficient to rebut the presumption that work is a substantial *factor* in causing the disability, that will always be enough to show that work cannot be the substantial *cause* of the disability.

We applied this logic in *Weaver v. ASRC Federal Holding Co.*, a case similar to Sumpter's because it involved possible aggravation of an underlying spine condition.[29] We acknowledged that our decision in *Huit* left open how the 2005 amendments affect the second stage of the presumption analysis when there is a competing cause, but declined to decide the issue "because [the employer] offered substantial evidence that rebutted the presumption under pre-2005 case law."[30] "Because [the employer's] evidence rebutted the presumption that work was a substantial factor in causing the disability, it necessarily rebutted a narrower presumption that work was the substantial cause."[31]

As in *Weaver*, we decline to address the effect of the 2005 amendments on the rebuttal stage because the District's evidence is sufficient to rebut the presumption under the pre-2005 standard. The medical opinions the Board cited were evidence which, if believed, would exclude work as a substantial factor in causing the disability.

---

[27] *Id.* at 917-20.

[28] *Id.* at 919.

[29] 464 P.3d 1242, 1252 (Alaska 2020).

[30] *Id.*

[31] *Id.* at 1252-53 (citing *Huit*, 372 P.3d at 919).

In order to rebut the presumption under the pre-2005 standard, an employer had to present substantial evidence that either (1) "provided an alternative explanation excluding work-related factors as a substantial cause of the disability," also called "affirmative evidence"; or (2) "directly eliminated a reasonable possibility that employment was a factor in causing the disability," also called "negative evidence."[32] Here, the District provided both kinds.

First, the District presented affirmative evidence quite similar to the evidence we deemed substantial in *Weaver*. There we held that a doctor's opinion that the employee "had degenerative disc disease that preexisted the 2013 injury report together with his opinion that [the employee's] continuing pain could be attributed to psychosocial factors provided an explanation that if believed would exclude work-related factors as a substantial cause."[33] The evidence cited by the Board in this case is comparable. Dr. Scarpino opined that Sumpter suffered at most a muscle strain in her upper back in December 2013 — not damage to her spine — which may have caused temporary neck pain but would have resolved within six weeks with treatment. Dr. Brooks agreed with this opinion, and Dr. Raymond gave a similar assessment. The doctors also indicated that Sumpter's degenerative disc disease caused her persistent symptoms. These opinions are affirmative evidence that work did not cause Sumpter's pain complaints: an alternative explanation that, if accepted, would exclude work as a substantial factor in Sumpter's continuing disability and need for medical treatment. A strain that resolves within weeks cannot be a cause of pain, disability, or need for medical care years later, but degenerative disc disease can. The three doctors' opinions

---

[32]     *See Huit*, 372 P.3d at 906-07 (first quoting *Tolbert v. Alascom, Inc.*, 973 P.2d 603, 611 (Alaska 1999); then quoting *Veco, Inc. v. Wolfer*, 693 P.2d 865, 872 (Alaska 1985)).

[33]     *Weaver*, 464 P.3d at 1253.

are exactly the type of opinion evidence that employers used to rebut the presumption of compensability before the 2005 amendments changed the causation standard for compensability.[34]

Second, Dr. Scarpino's testimony rebutted the presumption using negative evidence as well. Dr. Scarpino testified that Sumpter's repositioning the student was not the type of movement that would engage the neck muscles and cause increased degeneration, making it impossible for her work activities to be a cause of her neck complaints. This opinion, if believed, would eliminate any reasonable possibility that her work was a factor in causing the disability. Because this evidence rebuts the presumption of compensability under the "broader" pre-2005 standard, we affirm the Commission's ruling at the second stage.[35]

**B.     The Commission Correctly Concluded That Substantial Evidence In The Record Supports The Board's Conclusion That Employment Is Not The Cause Of Sumpter's Disability And Need For Medical Treatment.**

Sumpter also argues that the Commission erred in affirming the Board's weighing of the evidence at the third stage of the presumption analysis. Relying on the rule from *Universal Camera Corp. v. NLRB*,[36] which we have applied in some cases,[37]

---

[34]     *See Robinson v. Municipality of Anchorage*, 69 P.3d 489, 495 (Alaska 2003) (holding that employer rebutted presumption with doctor's opinions that work-related back strain would have resolved quickly and that back complaints were result of non-work-related car accident).

[35]     *See Weaver*, 464 P.3d at 1252-53 ("Because [the employer's] evidence rebutted the presumption that work was a substantial factor in causing the disability, it necessarily rebutted a narrower presumption that work was the substantial cause.").

[36]     340 U.S. 474 (1951).

[37]     *See, e.g., Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d
(continued...)

she maintains that the Board and Commission "overlook[ed] a significant body of evidence fairly detracting from the weight of the evidence."

The evidence Sumpter points to is not so compelling that we are convinced the Board's conclusion lacks substantial evidence to support it. The Board gave relatively less weight to Sumpter's testimony and the testimony of her family members about the onset and symptoms of her injury because it found Sumpter to be "not a good historian." The Board gave more weight to Dr. Brooks's and Dr. Scarpino's opinions because they reviewed extensive medical records. It gave the most weight to Dr. Scarpino's opinions — which maintained that the lift Sumpter described could not have injured her cervical spine but would only have caused a muscle strain that would quickly heal — because of his independence. The Board also thought it important that Dr. Scarpino and Dr. Brooks "agree[d] with each other." The Board discounted the medical opinions supporting Sumpter's claims. In particular, it found DeNapoli's opinion less credible because it was "based solely on what [Sumpter] has told her," which the Board found "troubling" because Sumpter's medical history "is unreliable and has changed over time." It decided that in comparison to all other causes, Sumpter's "pre-existing degeneration and cervical fusion" were the substantial cause of her disability and need for medical treatment. The Commission examined Sumpter's arguments related to the Board's findings and decided that substantial evidence supported the decision.

Sumpter's arguments can be roughly divided into three groups: (1) arguments about the Board's treatment of lay testimony; (2) arguments about asserted weaknesses and contradictions in the medical evidence; and (3) arguments about

---

[37]    (...continued)
624, 635 n.40 (Alaska 2011).

Sumpter's alternative theory that repetitive lifting, rather than the single "scooting" incident, caused her disability. We address each in turn.

### 1. Arguments about lay testimony

The Board is responsible for determining witness credibility and weighing the evidence in a workers' compensation case.[38] The Board here stated that Sumpter's admission that "she is not a good historian . . . impact[ed] her credibility." It then identified discrepancies in Sumpter's testimony related to the injury, noting that she had changed her descriptions of the way the injury happened, the immediacy of her pain, and the type of pain she experienced. The Board effectively found that Sumpter was not credible. And because the Board decided Sumpter was not credible, it gave less weight to testimony from witnesses who relied more on Sumpter's accounts of the injury than on review of written medical records. There was nothing improper in the Board doing so.

Sumpter's assertion that no doctor has found malingering in her case does not mean the Board was required to find her credible in all respects. The Board deemed her explanations about causation to be inconsistent enough to undermine her credibility about causation; this determination is within the Board's authority. No one doubted the severity of her pain, and Dr. Scarpino indicated that she was disabled. But Dr. Brooks thought she might be engaged in "opportunistic misattribution," and while the Board did not explicitly say so, its decision suggests that the Board agreed with Dr. Brooks on this point.

---

[38]     AS 23.30.122.

Sumpter argues that the Board failed to follow our decision in *Employers Commercial Union Co. v. Libor*[39] by not giving her testimony about her symptoms decisive weight. But in *Libor* we merely held that the Board *may* award compensation based solely on lay testimony about causation.[40] We did not hold that the Board *must* do so.

Sumpter also relies on *Smith v. University of Alaska, Fairbanks*[41] to argue that the Board improperly ignored "credible lay evidence" about causation when it discounted the testimony of her husband and sister. But the Board did not explicitly disregard the lay testimony in this case. Instead, the Board noted its concern that the lay witnesses' testimony was based in part on information Sumpter conveyed to them and repeated its finding that Sumpter was "not a good historian." This indicates that the Board did not give her family's testimony about the onset of her pain much weight because its foundation was untrustworthy and contradictory. In fact, at the hearing Sumpter contradicted the testimony her sister had just given about Sumpter's pain complaints in December. In light of the numerous inconsistencies in Sumpter's accounts of the injury we see no error in the Board's treatment of the lay testimony.

### 2. Arguments about medical evidence

The Board's conclusion that Sumpter's disability was not caused by her employment rested primarily on the opinions of Dr. Brooks and Dr. Scarpino. Sumpter's attack on this conclusion emphasizes differences between Dr. Brooks's and Dr. Scarpino's opinions. Although true that Dr. Brooks and Dr. Scarpino did not agree on every point, their opinions overlapped on salient issues related to diagnosis and

---

[39]    536 P.2d 129 (Alaska 1975).

[40]    *Id.* at 132.

[41]    172 P.3d 782, 789 (Alaska 2007).

causation. Both stated that Sumpter suffered at most a strain or sprain when she repositioned the student; such an injury would not cause prolonged pain or disability. Both also stated that the primary cause of her neck pain is her preexisting degenerative disc disease. Because the main disagreement in the case was causation, the doctors' agreement on the diagnosis and mechanism of Sumpter's ongoing pain complaints leads us to conclude there was no error in the Board's finding.

Sumpter argues that the differences in opinion between Drs. Scarpino, Brooks, and Raymond about the suitability of Sumpter's job in light of her unknown functional capacities makes the Board's reliance on the parts of these doctors' opinions that agree with each other untenable. This difference of opinion is not material to the causation question presented to the Board. Sumpter only presented one injury theory to the Board: that repositioning the student on December 18 caused her continuing pain and disability. Whether she had the physical capacities to do the job is not dispositive of whether this one incident caused her disability.

Drs. Scarpino, Brooks, and Raymond all agreed that the incident did not cause her ongoing symptoms, and the Board's reliance on those opinions is not flawed just because the doctors had different estimates of her general capacities. Dr. Scarpino acknowledged his disagreement with Dr. Raymond's opinion about Sumpter's lifting restrictions, stating that he did not consider Sumpter "to be at higher risk than someone without a fusion in relation to intermittent shifting or lifting type maneuvers." Dr. Scarpino's written report cited an article showing that 81% of patients who had underdone the same type of surgery as Sumpter "returned to strenuous work or sport activity" at "2-17 year follow up." Further, Dr. Scarpino explained why this particular lift would not cause Sumpter's ongoing disability: merely lifting a weight a few inches at waist level would not engage the cervical spine. In light of the considerable weight the Board gave to Dr. Scarpino's testimony, we are not persuaded that the disagreement

between the doctors about Sumpter's physical capacity means the Board's decision is flawed.

Nor are we persuaded that Dr. Westfall's deposition testimony necessarily outweighs Dr. Brooks's or Dr. Scarpino's opinion about causation. Sumpter cites Dr. Westfall's testimony that (1) it is not uncommon to have pain "a couple hours" after a lifting injury, (2) Sumpter "clearly had a tissue injury" when he examined her, and (3) a lifting injury could cause cervical pain. But Dr. Westfall referred Sumpter to Dr. Raymond specifically because Dr. Westfall could not determine whether her neck complaints were related to her work. The Board was entitled to give more weight to the opinions of physicians who "did a thorough records review" and were confident in their own opinions.

Sumpter's documentary exhibits are not so compelling that they make the doctors' opinions insubstantial by comparison. Sumpter offered a printout of her prescriptions to show she had not received pain medication specifically for neck pain during the relevant time before the injury. This evidence was intended to undermine Dr. Raymond's and Dr. Brooks's opinions that she had ongoing neck pain between her 2011 surgery and the work incident, which she argued contributed to the doctors' conclusions about causation. But even if true that she was not taking pain medication for her neck at that time, her evidence does not undermine Dr. Brooks's opinion that degeneration in Sumpter's cervical spine was inevitable following her fusion surgery and was most likely the main reason for her ongoing symptoms. Nor does it address Dr. Scarpino's opinion that the type of lifting she described would not activate her neck muscles and therefore could not be the cause of her neck complaints. Other exhibits Sumpter identifies in her brief — a copy of the job description for her position with the District, a printout about ergonomics and musculoskeletal injuries from a federal agency website, and copies of pages related to chronic pain from the American Medical Association's Guides to the

Evaluation of Permanent Impairment — do not convincingly rebut the doctors' opinions about what did and did not cause her ongoing disability.

Sumpter argues that neither Dr. Scarpino nor Dr. Brooks could identify with certainty the cause of her increased pain on December 24, 2013 (a little less than a week after the lifting incident), but she does not explain why they were required to do so. Both doctors opined that repositioning the student would have had little to no impact on her neck and underlying degenerative disc disease; those opinions eliminated the lifting incident as a substantial cause of her continuing pain complaints. The doctors did not need to provide an explanation for every pain symptom she experienced after she repositioned the student on December 18. In any event Dr. Brooks explained that people "not infrequently get their neck in an awkward position . . . when [they]'re unaware while sleeping" and that such positioning could cause painful compression on the nerve roots or spinal cord in someone like Sumpter with a narrowed spinal canal or foramina. Dr. Brooks considered it unlikely that Sumpter would have put her neck "in such an awkward position while conscious . . . because it hurts." This testimony and Dr. Scarpino's testimony about which muscles would be activated when repositioning the child supported the doctors' theory that Sumpter's increased pain on December 24 was unrelated to her work injury.

Finally, Sumpter argues that the Board failed to acknowledge or adequately address the fact that her husband's and sister's testimony "about the timing and onset of Sumpter's debilitating chronic pain" undercut the medical testimony the Board relied on. We see nothing in either her husband's or sister's testimony that invalidates the medical evidence. Sumpter's husband testified that Sumpter reported feeling some pain when she repositioned the student, and he supported Sumpter's testimony that the pain became severe the morning of December 24. Sumpter's sister testified about her observations of Sumpter during a trip they took together in March 2014 and recounted conversations

she had with Sumpter about the pain closer to the time of injury. The doctors the Board relied on concluded Sumpter's greatly increased pain on December 24 was unrelated to the work injury. And Dr. Brooks stated that not every symptom is an injury, suggesting that whether Sumpter felt transient pain on December 18 is not sufficient to establish that she injured herself that day. Finally, both Drs. Brooks and Scarpino opined that if she did experience pain on that day it was likely a sprain or strain, not an injury to her cervical spine that would cause pain and disability months and years later. Thus the lay testimony about pain does not undercut the medical opinions about causation.

### 3. Arguments about repetitive lifting

Sumpter contends that the Board made a legal error at the third stage because it failed to consider all of the possible causes of her continuing disability and need for treatment. The alternative cause Sumpter asserts the Board should have considered is repeated repositioning of the student over the course of the approximately seven weeks she worked as an aide. The District responds that Sumpter did not advance an injury theory related to repeated lifting before the Board and that to the extent repeated lifting was at issue, Dr. Scarpino's testimony eliminated it as an injury mechanism.

Sumpter did not clearly articulate to the Board the causation theory she now proposes on appeal: that repeatedly repositioning the student was a competing cause of her disability — a mechanism of injury distinct from the single traumatic lift on December 18. Sumpter did not present repetitive lifting as a separate injury mechanism at her deposition or in her workers' compensation claim, nor did she file a second report of injury, alleging she had suffered a different injury than the single incident reported to

the District.[42]  Her pre-hearing brief and closing brief each referred, without much explanation, to a single-page "physician statement" by Dr. Wright prepared for her occupational disability case, which listed the cause of her disability as "lifting student 4x /day stress cervical spine."  And she did pose questions to Dr. Scarpino about repeatedly repositioning the student, which the Board permitted over the District's objection.  But in light of Sumpter's scattershot approach to briefing and argument, these oblique references to the issue of repeated lifting did not squarely present an alternative theory of causation for the Board's consideration.

In any event, Dr. Scarpino rejected this theory of causation in two different ways.  Dr. Scarpino responded to questioning about repeated lifting by pointing out that Sumpter had never complained about pain from any other time she repositioned the student.  And when asked whether the December 18 maneuver could have been "the straw that broke the camel's back," Dr. Scarpino reiterated his opinion that repositioning the student would not impact Sumpter's neck.  Because Dr. Scarpino, whose opinions the Board gave the most weight, effectively ruled out a repetitive lifting theory of causation, we see no error in the Board's analysis.

The medical opinions the Board found most convincing provided substantial evidence to support its decision, and the Commission did not err by affirming that decision.

---

[42]  *Cf. Groom v. State, Dep't of Transp.*, 169 P.3d 626, 628-31 (Alaska 2007) (detailing differences in workers' compensation claims that alleged different injury theories).

### C. The Board Made Adequate Findings.

"When an employee makes a claim for compensation, the Board 'may hear and determine all questions in respect to the claim.' "[43] "The Board need only make findings with respect to issues that are both material and contested."[44] "When the Board fails to make a necessary finding, we cannot fill the gap by making our own determination from the record; we must remand to the Board."[45] Sumpter maintains the Board failed to make adequate findings, identifying six issues the Board did not explicitly address that were in her view both material and contested. But some of the identified issues were necessarily decided by the Board's resolution of other issues, and others are not material to Sumpter's right to compensation.[46] We therefore find no error.

Sumpter contends the Board was required to determine whether Dr. Raymond was biased because of statements he made during his appointment with her in December 2013. But this issue is not material because it does not affect Sumpter's right to compensation. Even if the Board thought Dr. Raymond was biased in favor of the District, the finding does not impact the Board's ultimate conclusion, which rested primarily on Drs. Brooks and Scarpino, especially the latter's opinion that the lifting Sumpter described would not affect the cervical spine.

Sumpter also argues that the Board was required to find whether the position's job duties exceeded her physical capacity, which several doctors — notably

---

[43] *Bolieu v. Our Lady of Compassion Care Ctr.*, 983 P.2d 1270, 1274-75 (Alaska 1999) (citing AS 23.30.110(a)).

[44] *Id.* at 1275.

[45] *Id.*

[46] *See id.* ("An issue is material in a workers' compensation dispute if it 'affect[s] the right to compensation.' " (alteration in original) (quoting MCCORMICK ON EVIDENCE § 185 (John William Strong ed., 4th ed. 1992))).

Drs. Raymond and Scarpino — disagreed about. But whether Sumpter was able to do the job and whether the lift on December 18 caused injury to her cervical spine are distinct and independent questions. In light of Dr. Scarpino's testimony that repositioning the student would not affect Sumpter's neck and Sumpter's failure to present repeated lifting as a different injury mechanism, the issue was not material.

Next, Sumpter asserts the Board failed to make two findings related to the onset of her pain: (1) whether she told Dr. Westfall "about the jolt of pain" and (2) whether Dr. Scarpino's testimony about her cervical pain is contradicted by her medical records. The first point is not material because Sumpter did not see Dr. Westfall for more than a week after the injury, and it is undisputed that she failed to mention any pain to the only healthcare provider she saw before seeing Dr. Westfall. The Board's finding that Sumpter has been inconsistent in her account of the injury therefore stands regardless of how she described her pain to Dr. Westfall.

And the second assertion — that her medical records contradict Dr. Scarpino's testimony that Sumpter's cervical headaches did not start on the day of the "scooting" incident — is simply not supported by the record. The medical records Sumpter cites are dated after December 24, when she testified she awoke in considerable pain. Both Dr. Brooks and Dr. Scarpino discounted repositioning the student as the cause of Sumpter's pain on December 24. As we explained earlier, these doctors both said repositioning the student would not have caused the increased pain she felt on December 24. So there is no inconsistency to resolve.

The last two issues Sumpter identifies are whether repositioning the student made Sumpter's preexisting degenerative disc disease symptomatic and whether her "severe cervicogenic headaches originated in the cervical area." The Board's decision to credit Dr. Scarpino's testimony, including his opinions about causation, necessarily decided these issues adversely to Sumpter. Dr. Scarpino testified that repositioning the

student would have no impact on Sumpter's disc disease because the maneuver would not engage her neck and therefore could not cause the disc disease to become symptomatic. He indicated that any strain or sprain injury she had would have been in her upper back. Whether Sumpter's headaches originated in the cervical area was immaterial to the question of causation because nothing in the opinions the Board credited connected the headaches to repositioning the student.

We conclude the Board made adequate findings to permit our review of its decision.

## V.    CONCLUSION

We AFFIRM the Commission's decision.