Esther J. RUNSTROM, Appellant,

v.

ALASKA NATIVE MEDICAL CENTER and Alaska National Insurance Company, Appellees.

No. S-14294.

Supreme Court of Alaska.

July 20, 2012.

61. *Id.*

62. *Id.*

Esther J. Runstrom, pro se, Big Lake, Appellant.

Richard L. Wagg and Vicki A. Paddock, Russell, Wagg, Gabbert & Budzinski, Anchorage, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

A healthcare worker was sprayed in the eye with fluids from an HIV-positive patient. She received preventive treatment and counseling. Her employer initially paid workers' compensation benefits; it later filed a controversion based on its doctor's opinion that the employee was able to return to work. The employee asked for more benefits, but the Alaska Workers' Compensation Board denied her claim. The employee appealed, but the Alaska Workers' Compensation Appeals Commission affirmed the Board's decision. Because we agree with the Commission that substantial evidence supports the Board's decision, we affirm the Commission's decision.

## II. FACTS AND PROCEEDINGS

In 2007 Esther Runstrom worked for the Alaska Native Tribal Health Consortium (the employer) as a patient services assistant at the Alaska Native Medical Center. In August she was assisting a nurse in the critical care unit when she experienced a "[h]igh risk splash" to her eye by fluids from an HIV-positive patient. She washed her eye and went to the emergency room. The emergency room doctor consulted with a doctor at the AIDS hotline in San Francisco and prescribed an antiretroviral medication as a preventive measure. Runstrom returned to work the following week, but at some point was told to leave because she did not want to do patient care. Runstrom received temporary total disability (TTD) beginning in September.

Runstrom consulted with nurse practitioner Ellen Lentz, her primary healthcare provider, a few days after the exposure. Lentz's chart notes showed the primary treatment plan was "[s]tress management and relaxation." Lentz referred Runstrom to counseling with Denny Tranel, a licensed clinical social worker; Runstrom first saw Tranel on September 11. Runstrom saw Tranel for at least three months. During this period of time she also had blood tests to check her HIV status. On October 3 Lentz asked for Runstrom to be excused from work until December 7.

On October 15 Dr. Eric Goranson conducted an employer's independent medical evaluation (EIME) of Runstrom. Dr. Goranson indicated Runstrom's case was "difficult from a number of standpoints," in part because of conflicting reports from Runstrom and the employer. Because Tranel had diagnosed Runstrom with "traumatic stress secondary to exposure to AIDS," Dr. Goranson briefly discussed whether Runstrom met the diagnostic criteria for posttraumatic stress disorder (PTSD), but felt a "diagnosis of adjustment disorder with mixed emotional features would be more appropriate than the diagno-

sis of PTSD." According to Dr. Goranson, Runstrom's adjustment disorder was connected to the work-related HIV exposure. He also diagnosed Runstrom with preexisting conditions that, in his opinion, contributed to her need for medical treatment for anxiety. In Dr. Goranson's opinion, for the "first several weeks" the work-related accident was "the major contributing cause of her need for treatment," but "as time [went] on, the non-work-related factors [were] contributing to a more significant part of her ongoing symptoms and need for treatment." Dr. Goranson recommended a specific course of treatment with someone other than Tranel. Dr. Goranson thought "it might be appropriate to consider that, if [Runstrom's] three-month HIV test [was] negative, that the work-related factors are no longer the main contributing cause (substantial factor) in her ongoing need for treatment."

The employer sent Dr. Goranson's report to Lentz with a note asking if she "concur[red] with his finding and recommendations, specifically counseling to include exposure and response prevention treatment and cognitive behavioral therapy approximately once per week of short duration, return to work with a gradual re-entry to the workplace, initial non-patient care transitioning into full patient care." On November 6, Lentz answered "yes" and, as instructed by the employer, wrote two prescriptions: one for "[c]ognitive behavioral therapy weekly" with the notation that Runstrom "would like to continue with Mr. Tranel" and one for "[e]xposure and response prevention treatment." It is not clear what happened with these prescriptions. The record does not contain notes from any sessions with Tranel after November 8, and the notes from the November 8 session did not mention cognitive behavioral therapy. A later chart note from another healthcare provider indicated Runstrom continued to consult with Tranel over the telephone, but there is no indication in the record that Runstrom received the therapy Lentz prescribed.

On November 12 Lentz cleared Runstrom to return to work with restrictions, specifically "no patient care/contacts" until December 1. Runstrom's later three-month HIV test was negative. Runstrom applied for several positions with the employer not involving patient care, but she was not hired for any of them. On December 10 the employer controverted TTD and temporary partial disability (TPD) benefits after December 1, saying it had "offered to assist with a re-integration plan to place [Runstrom] back into her position" but she did not want to do so; it did not controvert further medical care at that time. The employer terminated Runstrom's employment effective January 11, 2008, because she had taken too much leave.

Dr. Goranson did a second EIME in February 2008 to assess medical stability and need for further medical treatment. Dr. Goranson said it was "difficult" to answer whether Runstrom was medically stable, in part because she had not received the medical treatment he had recommended and Lentz had prescribed. He gave the opinion that Runstrom was "medically stable as of [November 12, 2007] when Ms. [Lentz] returned her to work." He then wrote that "placing [Runstrom] at her regular job duties ... would be counterproductive unless the treatment modalities were in place." He thought treatment would be related to "pre-existing non-work related factors," so with respect to the work injury, Dr. Goranson believed Runstrom was able to return to work as of November 12, 2007 "as noted by Ms. [Lentz]."

Runstrom continued to be checked for HIV reactivity; her tests from February, May, and November 2008 were negative. In May 2008 the employer controverted further counseling. In August 2009 Runstrom filed a workers' compensation claim for TTD, penalties and interest if applicable, and unfair or frivolous controversion. According to Runstrom her injuries included the initial exposure, the side effects of the antiretroviral medication, and the "mental effects of being exposed to a fatal sexually transmitted disease." The employer answered and denied all claims; it also filed another controversion.

Runstrom's claim hearing before the Board was brief. There were no witnesses, although Runstrom was put under oath. The parties agreed that medical benefits were not an issue; they identified the issues as TTD,

unfair or frivolous controversion, and penalties.[1] Runstrom submitted letters from friends to support her claim, as well as a summary of medical literature related to HIV exposure in healthcare workers interwoven with the story of her exposure and treatment. The employer did not object to admission of these documents. Runstrom argued that Dr. Goranson's report was not substantial evidence because there was no evidence she had preexisting mental health problems. Runstrom also said that she had interpreted Lentz's comments in November as agreeing that Runstrom needed more counseling, not that Runstrom could return to work.

The Board first decided Runstrom had not attached the presumption of compensability that she was entitled to more TTD because she "presented no medical evidence she is unable to work as a result of [her] exposure."[2] It also said that "the exposure plus [Runstrom's] statements that she is unable to work as a result of the stress from the exposure may be sufficient to raise the presumption." It then alternatively decided, assuming Runstrom had attached the presumption, that the employer had rebutted the presumption through Dr. Goranson's reports. The Board set out the following test for rebutting the presumption: "An employer may rebut the presumption with medical testimony that rules out work as the substantial cause of an employee's disability." It decided that Dr. Goranson's reports met that standard. The Board then decided Runstrom had not proved her claim by a preponderance

of the evidence because: (1) Lentz released her to work on November 12, 2007; (2) she had applied for non-patient work with the employer and had worked elsewhere in the summer of 2008; and (3) she had received unemployment after she was terminated by the employer. The Board also decided the employer's controversions were not frivolous or unfair because they were based on Dr. Goranson's reports, characterized by the Board as "the kind of medical opinion upon which an employer may rely in good faith to controvert a claim."

Runstrom appealed the decision to the Commission. She argued that the EIME reports were not substantial evidence because of inaccuracies and bias. She mentioned a mental stress case and questioned whether the Board had resolved doubt in her favor. The employer argued that substantial evidence supported the Board's decision.

The Commission decided the Board erred in its legal analysis. But rather than remanding the case to the Board, the Commission determined the Board's findings were sufficiently detailed that it could apply its own judgment to the case. The Commission interpreted 2005 amendments to the Alaska Workers' Compensation Act as changing the presumption analysis at the second and third stages,[3] although this issue was not raised by the parties.[4] The Commission wrote that "if the employer can present substantial evidence, that if believed, demonstrates that a cause other than employment played a greater role in causing the disability, etc., the presumption is rebutted." It decided that

---

1. There was a later exchange between the Chair and Runstrom in which Runstrom indicated that she needed additional counseling but did not want to go unless the employer did not have access to the records. At oral argument before us, Runstrom clarified that she was not and is not seeking medical benefits for continued counseling.

2. Workers' compensation claims have been subject to a three-step presumption analysis in which the employee must first attach the presumption of compensability by presenting some evidence linking work and the injury. *McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 620 (Alaska 2011) (citing *Smith v. Univ. of Alaska, Fairbanks*, 172 P.3d 782, 788 (Alaska 2007)). If the employee is able to do so, the employer then has to rebut the presumption. The standard

we have articulated for rebutting the presumption requires the employer to produce substantial evidence that: (1) provides an alternative explanation which would exclude work-related factors as a substantial cause of the disability; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability. *Id.* (citing *Smith*, 172 P.3d at 788). If the employer meets its burden of producing evidence, the burden then shifts back to the employee to prove all elements of the employee's claim by a preponderance of the evidence. *Id.* at 621.

3. *See* note 2, above.

4. Our review of the record discloses no discussion of this point in either of the parties' briefs to, or at oral argument before, the Commission.

the second method of rebutting the presumption from prior case law—directly eliminating any reasonable possibility that employment was a factor in causing the disability—was "incompatible with the statutory standard for causation under AS 23.30.010(a)." The Commission said the Board "applied the three-step analysis under former law" but because the Board "held [the employer] to a higher standard than required of it to rebut the presumption," it agreed with the Board that the presumption had been rebutted. It then concluded that substantial evidence supported the Board's decision that Runstrom was not entitled to TTD after December 1, 2007. It also affirmed the Board's decision that the controversions were in good faith.

Runstrom appeals.

## III. STANDARD OF REVIEW

■ In an appeal from the Commission, "we review the [C]ommission's decision and apply our independent judgment when there is a question of law not involving agency expertise."[5] We also independently review the Commission's conclusion that substantial evidence in the record supported the Board's factual findings, which "requires us to independently review the record and the Board's factual findings."[6]

## IV. DISCUSSION

### A. Runstrom Suffered A Physical–Mental Injury Covered By The Presumption Analysis.

■ As we noted in *Kelly v. State, Department of Corrections,* "[w]ork-related mental injuries have been divided into three groups for purposes of analysis."[7] A "physical injury that causes a mental disorder" is considered a "physical-mental" claim; a "mental stimulus that causes a mental disorder" is considered a "mental-mental" claim; and a "mental-physical" claim occurs when a mental stimulus causes a physical injury, such as a heart attack.[8] Classification is important because the presumption of compensability does not apply to mental-mental claims,[9] making them generally more difficult to prove, and those claims must be based on unusual and extraordinary work-related stress.[10] The fact that an accident produces unusual stress does not transform it into a mental-mental claim—the key to analyzing such claims is to look at the underlying cause of the disability, which in this case was the "[h]igh risk splash."

*Kelly* involved a prison guard who was diagnosed with PTSD after an on-the-job incident in which a murderer threatened him with a sharpened pencil.[11] The guard's claim was based on stress from the threat; he never alleged a physical injury.[12] Runstrom's claim similarly arose from a discrete incident—the splash that exposed her to HIV, which was undoubtedly frightening after she realized she had been exposed to a potentially fatal disease. Runstrom's claim, however, did not arise from job-related stress—her claim arose from a physical injury for which she was treated in the emergency room and later with medication. The Commission agreed with the Board that Runstrom's claim was not a mental-mental claim, rejecting Runstrom's argument to the contrary. We agree with the Commission.

■ Compensation cases involving exposure to disease, when the likelihood of exposure is increased by work, are generally classified as physical claims.[13] Psychological

---

5. *Shehata v. Salvation Army,* 225 P.3d 1106, 1113 (Alaska 2010) (citing *Barrington v. Alaska Commc'ns Sys. Grp., Inc.,* 198 P.3d 1122, 1125 (Alaska 2008)).

6. *Smith v. CSK Auto, Inc.,* 204 P.3d 1001, 1007 (Alaska 2009).

7. 218 P.3d 291, 298 (Alaska 2009) (citing 3 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 56.01 (2008)).

8. *Id.*

9. AS 23.30.120(c).

10. AS 23.30.010(b).

11. 218 P.3d at 293–94.

12. *Id.* at 294. Kelly's claim initially was a mental-physical claim because he suffered stress-related angina. *Id.*

13. *See Doe v. City of Stamford,* 241 Conn. 692, 699 A.2d 52 (1997) (police officer's exposures to HIV and tuberculosis compensable injuries even

claims arising from physical claims are analyzed as part of the physical claim: "when there has been a physical accident or trauma, and [a] claimant's disability is increased or prolonged by traumatic neurosis, ... it is now uniformly held that the full disability including the effects of the neurosis is compensable." [14] The Commission was therefore correct in deciding that Runstrom's claim was not a mental-mental claim and that her claim should be analyzed under AS 23.30.010(a) because Runstrom's mental stress followed from the physical event of HIV exposure.

### B. The Commission Correctly Decided That Substantial Evidence Supported The Board's Decision.

■ Runstrom argues that she is entitled to additional TTD because the employer did not present substantial evidence to rebut the presumption that she was disabled from working. The employer contends that the Commission correctly decided that substantial evidence in the record supported the Board's decision.

As the Commission observed, the Board provided two alternative analyses of Run-

strom's claim, one deciding that she had not attached the presumption of compensability and one assuming she had. The employer did not dispute that Runstrom was initially unable to work because of her work-related injury. "Once an employee is disabled, the law presumes that the employee's disability continues until the employer produces substantial evidence to the contrary." [15] We therefore examine whether the employer rebutted the presumption.

As we noted earlier, the Commission decided that the Board erred as a matter of law in its application of the presumption analysis because in its view the Board applied an incorrect legal standard at the second stage. In her brief to us, Runstrom did not raise this issue; in its brief the employer argued only that the Commission's new interpretation of the presumption analysis supports the Board's decision. Because Runstrom did not appeal this issue and because the employer rebutted the presumption under either standard, we do not reach the question whether the Commission erred in interpreting AS 23.30.010(a) and its impact on the presumption analysis.[16]

though he did not test positive for either disease); *Ky. Emp'rs Safety Ass'n v. Lexington Diagnostic Ctr.*, 291 S.W.3d 683 (Ky.2009) (blood splatter to eye from HIV-infected patient is compensable injury even though worker did not develop disease); *Jackson Twp. Volunteer Fire Co. v. Workmen's Comp. Appeal Bd. (Wallet)*, 140 Pa.Cmwlth. 620, 594 A.2d 826 (1991) (volunteer ambulance worker's exposure to HIV-infected blood was compensable injury). *See also Ark. Dep't of Corr. v. Holybee*, 46 Ark.App. 232, 878 S.W.2d 420 (1994) (affirming finding that testing and preventive treatment for HIV were reasonably necessary medical care for prison guard bitten by HIV-positive prisoner). These cases deal with payment for medical care, such as HIV testing.

**14.** 3 ARTHUR LARSON & LEX K. LARSON. LARSON'S WORKERS' COMPENSATION LAW § 56.03[1] (2011).

**15.** *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 458 (Alaska 1997) (citing *Bailey v. Litwin Corp.*, 713 P.2d 249, 254 (Alaska 1986)).

**16.** We are concerned, however, with the manner in which the Commission interpreted the statute. In their briefs before the Commission neither party mentioned or discussed the change in the causation standard in AS 23.30.010(a) and its potential impact on Runstrom's case. More to the point, neither party discussed whether the

2005 amendments to the Act had any effect on the second stage of the existing presumption analysis. And the Commission did not ask the parties questions about the issue at oral argument or request supplemental briefing.

There are some issues that a court or administrative agency should raise on its own, such as subject matter jurisdiction, *Monzulla v. Voorhees Concrete Cutting*, 254 P.3d 341, 344 (Alaska 2011), and we acknowledge that at times the lack of subject matter jurisdiction is so apparent that briefing on the issue is not necessary. *See Robertson v. Riplett*, 194 P.3d 382, 386 (Alaska 2008) (deciding without requesting supplemental briefing that Alaska courts lacked subject matter jurisdiction over custody modification because resolution of the issue was "so self-evident that ordering supplemental briefing would merely delay the resolution of [an] expedited appeal"). But in this case the Commission decided a substantive legal issue, which could have precedential value both for it and the Board, without giving notice that it would consider the issue or providing the opportunity to present argument about it. We have held that similar action by a trial court violated due process, *see Price v. Eastham*, 75 P.3d 1051, 1056 (Alaska 2003) (holding that court's failure to give parties notice ... violated due process), and we have also held that due process applies in administrative proceed-

To rebut the presumption that Runstrom remained temporarily totally disabled, the employer needed to produce evidence that she could return to work. In Dr. Goranson's first report, he said that Runstrom was able to and should return to work as soon as possible; he also gave the opinion that, "if the three-month HIV test [was] negative," Runstrom was medically stable with respect to the work-related injury.[17] Viewed in isolation,[18] this evidence rebutted the presumption that Runstrom continued to be unable to work.

Relying on *Black v. Universal Services, Inc.*,[19] Runstrom argues that Dr. Goranson's reports are not substantial evidence that could rebut the presumption because they are biased and have multiple mistakes. *Black* is distinguishable, however, because the claimant there offered testimony from a number of medical providers that contradicted the EIME report.[20] Here, in contrast, Runstrom's treating healthcare provider agreed with the EIME's proposed treatment plan and signed a return-to-work form indicating that Runstrom could resume her former work after a few weeks with no patient contact. Runstrom did not depose Dr. Goranson or try to call him as a witness, so her claims are based on her interpretation of the reports rather than admissions by Dr. Goranson. Because Runstrom did not challenge the EIME conclusions and diagnoses through cross-examination or testimony from her treating providers, there was no conflicting medical testimony to undermine Dr. Goranson's medical opinions.

At oral argument before us, Runstrom relied on Lentz's chart notes to argue that medical evidence supported her claim. But Lentz's return-to-work form would have been adequate to rebut the presumption even in the absence of Dr. Goranson's report. Lentz apparently contemplated that Runstrom would return to work after or in conjunction with a treatment plan as outlined in the first EIME report: Lentz wrote prescriptions so that Runstrom could get specific treatment and returned Runstrom to work, with restrictions at first, but with a deadline for lifting the restrictions. At the hearing Runstrom did not explain why she did not follow through with the prescribed treatment, nor was there any indication that Runstrom asked Lentz to change the return-to-work form. Lentz cleared Runstrom to work with patients after December 1, 2007. Because Runstrom's primary healthcare provider said Runstrom was able to work at her previous position without restrictions as of December 1, 2007, the Commission correctly decided substantial evidence in the record supported the Board's finding that the employer rebutted the presumption that Runstrom continued to be disabled from working.

After the employer rebutted the presumption, Runstrom had to show that the HIV exposure was the substantial cause of her inability to return to work.[21] She did not meet that burden. Runstrom's hearing testimony indicated that she was concerned about whether she might still become HIV-positive from the work-related exposure. She was also afraid of being exposed to HIV again: she indicated she refused to get some medi-

ings. *Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 266 (Alaska 2000).

Whether or how the 2005 amendments to the Act modified the existing three-step presumption analysis is an open question. We do not decide whether the Commission is correct that the amendment results in a change of an employer's burden at the second stage of the presumption analysis, but we note that parts of the legislative history suggest that the presumption analysis was to remain unchanged until the third step. *See, e.g.*, Minutes, H. Free Conference Comm. on S.B. 130, 24th Leg., 1st Sess., at 10 (May 21, 2005) (testimony of Kristin Knudsen, Assistant Attorney Gen.) (stating that employer's burden is "unchanged"). We encourage the Commission to take up the issue again when it can be fully briefed by parties before it in an appeal, and to

provide a thorough explanation of its reasoning and decision.

**17.** A finding of medical stability also ends a worker's eligibility for TTD. AS 23.30.185.

**18.** *McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 620 (Alaska 2011) (citing *Stephens v. ITT/Felec Servs.*, 915 P.2d 620, 624 (Alaska 1996)).

**19.** 627 P.2d 1073 (Alaska 1981).

**20.** *Id.* at 1076.

**21.** AS 23.30.010(a).

cal care because of her fears of exposure. But she did not present evidence from healthcare providers to contradict Lentz's statement about her ability to return to work, including performing patient care, after December 1, 2007.

Because both Lentz and Dr. Goranson thought Runstrom could return to her prior work after December 1, 2007, and Runstrom did not offer any evidence from a healthcare provider to contradict these opinions, the Commission correctly determined that substantial evidence in the record supported the Board's decision that Runstrom was not entitled to further TTD.

### C. The Commission Correctly Decided That The Controversions Were In Good Faith.

■ Runstrom argues that the employer's controversions were frivolous and unfair in large part because they were based on Dr. Goranson's reports, which she does not regard as substantial evidence. The employer counters that the Board's decision was correct because it could rely on Dr. Goranson's opinion to controvert Runstrom's care.

■ A controversion must be made in good faith in order for an employer to avoid a penalty: "the employer must possess sufficient evidence in support of the controversion that, if the claimant does not introduce evidence in opposition to the controversion, the Board would find that the claimant [was] not entitled to benefits." [22] Whether the employer acted in good faith is a factual issue.[23]

Dr. Goranson's report met this standard. If Runstrom had introduced no evidence opposing the controversion, the Board could have found she was not entitled to benefits based on Dr. Goranson's report. In October 2007 Dr. Goranson said Runstrom was able to and should return to work. Lentz agreed with the report, and she wrote prescriptions directing Runstrom to receive the treatment recommended in the EIME. The employer did not file the controversion until after December 1, 2007, when Lentz said Runstrom

could return to patient care. The Commission, and the Board, correctly concluded that the controversions were not unfair or frivolous.

## V. CONCLUSION

Subject to our caveat in footnote 16, we AFFIRM the Commission's decision.

---

**22.** *Harp v. ARCO Alaska, Inc.*, 831 P.2d 352, 358 (Alaska 1992) (citing *Kerley v. Workmen's Comp. App. Bd.*, 4 Cal.3d 223, 93 Cal.Rptr. 192, 481 P.2d 200, 205 (1971)).

**23.** *See Bailey v. Tex. Instruments, Inc.*, 111 P.3d 321, 324 (Alaska 2005).