*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SHANNON K. PATTERSON, ) | |
| ) | Supreme Court No. S-17958 |
| Appellant, ) | |
| ) | Alaska Workers' Compensation |
| v. ) | Appeals Commission Nos. 18-023, |
| ) | 19-020 |
| MATANUSKA-SUSITNA ) | |
| BOROUGH SCHOOL DISTRICT, ) | O P I N I O N |
| ) | |
| Appellee. ) | No. 7635 – December 23, 2022 |
| ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Richard L. Harren and H. Lee, Law Offices of Richard L. Harren, P.C., Wasilla, for Appellant. Nora G. Barlow, Barlow Anderson, LLC, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

BORGHESAN, Justice.

## I.     INTRODUCTION

An elementary school nurse who unsuccessfully attempted to save the life of a choking child sought workers' compensation benefits for mental health problems she attributed to the incident. She argued that she suffered post-traumatic stress disorder (PTSD) due to exposure to the child's bodily fluids and resulting risk of disease and to

the mental stress of the incident. The Alaska Workers' Compensation Board denied her claims, concluding that her exposure to bodily fluids was not a sufficient physical injury to trigger a presumption of compensability and that the mental stress of the incident was not sufficiently extraordinary or unusual to merit compensation. The Board was most persuaded by the opinion of the employer's medical expert that the nurse's mental health problems were the result of a pre-existing mental health condition and were not caused by the incident. The Alaska Workers' Compensation Appeals Commission affirmed.

We note two errors in the Board's analysis but ultimately affirm the denial of benefits. The Board failed to recognize the link between exposure to bodily fluids and mental distress over the risk of serious disease, which under our precedent is enough to establish a presumption that the mental distress is compensable. The Board also failed to consider the particular details of the child's death and the nurse's involvement when it concluded as a general matter that the stress of responding to a choking incident at school is not sufficiently extraordinary to merit compensation for mental injury. But because the Board found in the alternative that the incident was not the cause of the nurse's mental health problems, and because both the Commission and this court must respect the Board's credibility determinations and the weight it gives conflicting evidence, we affirm.

## II. FACTS AND PROCEEDINGS

### A. The Choking Incident And Immediate Aftermath

In September 2014 Shannon Patterson worked for the Matanuska-Susitna Borough School District as an elementary school nurse. One day children ran into her office screaming because a child was choking on his lunch. Patterson ran to assist the child, who was turning blue when she arrived. Patterson tried to clear the child's airway and helped perform CPR until emergency medical personnel arrived and rushed the child to the hospital. The child later died as a result of the choking incident.

Because Patterson had been exposed to the child's bodily fluids, she had medical tests to screen for serious diseases shortly after the incident; her results came back negative. The District reported the injury to the Board, indicating it affected "multiple body parts," with the cause of injury shown as "absorption, ingestion or inhalation." The District paid Patterson temporary total disability benefits for about three months. Patterson's doctors wrote notes excusing her from work because of "on-site trauma" and "situational stress."

Patterson sought counseling shortly after the incident. Patterson's doctors initially diagnosed her with adjustment disorder, later changing her diagnosis to include PTSD.

In December 2014 the District required Patterson to be evaluated by a psychiatrist, Dr. David Glass. Dr. Glass did not think Patterson had any ongoing mental health concerns related to work. He diagnosed a non-work-related mood disorder. He did not diagnose a personality disorder, but he noted that "personality psychodynamics and psychosocial factors are involved with Ms. Patterson's symptoms." Dr. Glass thought Patterson's main problem was dissatisfaction with working as an elementary school nurse, an occupational problem rather than a mental health problem. He concluded that any ongoing mental health problems were not work related, that she was medically stable, and that she was able to return to work as a school nurse. He acknowledged that the choking incident would be "quite distressing" but thought Patterson could have dealt with the distress and returned to work after a few sessions with her counselor. When asked his opinion as to whether the work stress caused by the choking incident was extraordinary and unusual,[1] Dr. Glass allowed that the "tragedy"

---

[1] When an employee makes a mental stress claim, AS 23.30.010(b) requires, among other things, proof that "the work stress was extraordinary and unusual in
(continued...)

might be unusual in that it was "not a common occurrence," but he thought "aspiration crises with small children" would not be unusual events for a school nurse. The District controverted benefits based on Dr. Glass's report.

In February 2015 Patterson returned to work, in line with recommendations of her counselor, Dr. Kevin O'Leary, and her treating physician, Dr. Duane Odland. She returned in a school nurse position that sent her to different schools as needed.

## B.    Patterson's Claims For Disability Benefits

Patterson, representing herself, filed her first written workers' compensation claim in February 2015, seeking temporary total disability benefits for one month, temporary partial disability benefits starting in early February, medical and transportation costs, and a second independent medical evaluation (SIME). The claim identified "[e]xposure to possible blood born[e] pathogens/unknowns . . . and post incident emotional stress, anxiety, grief & depression" as the type of injury; she noted her "mouth, nose, face, hair, hands, lungs and blood stream" and "[m]ind" as the body parts injured. The District answered, admitting it had paid temporary total disability for a period of time and denying it was liable for further payments.

Patterson had a contract with the District for the 2015-16 school year, working as a nurse at another elementary school. Patterson declined an offer to renew her contract with the District for the 2016-17 school year because she thought — incorrectly as it turned out — that her retirement benefits had already vested. She submitted a resignation email on May 17, 2016. The following month Patterson, still representing herself, filed an amended claim for workers' compensation. In this claim she identified her "Psyche" as the injured body part and "PTSD, Anxiety, Depression"

---

[1]    (...continued)
comparison to pressures and tensions experienced by individuals in a comparable work environment."

as the illness or injury. She claimed her symptoms were aggravated by continuing to work as a school nurse. Until this time Patterson had been seeing Dr. O'Leary, who believed she continued to suffer from PTSD. But their treatment relationship ended in the summer of 2016.

Attorney Richard Harren entered an appearance before the Board on behalf of Patterson in late July 2016. In early 2017 Harren filed a petition that included a request for an SIME and review of discovery disputes but did not then file the forms the Board requires when requesting an SIME.[2]

Patterson was referred to a psychologist, Dr. Paul Wert, for an evaluation in late April 2017. Dr. Wert diagnosed PTSD, depression, and an anxiety disorder; he additionally noted "[d]ependent, avoidant (socially), and possibly borderline personality features or traits." The evaluation was filed with the Board in May 2017, and at the end of June Patterson requested a hearing on her written claims. The District opposed setting a hearing because discovery was ongoing.

Patterson deposed Dr. Jay Johnson, a former employer who had provided her medical care. Dr. Johnson was retired but had practiced psychiatry in Alaska, treating children and adolescents. He agreed with Dr. Wert that Patterson had PTSD. Dr. Johnson thought the choking incident had left Patterson continually anxious about another episode, although he acknowledged Patterson had life-long anxiety. He testified that the child's death would be extraordinary and unusual stress for a school nurse. He said he had experienced patients' deaths when he was practicing as a pediatrician and described it as "a horrible feeling."

---

[2]    8 Alaska Administrative Code (AAC) 45.092(g)(2)(A) (2021).

In June 2017 Patterson began to see another counselor, Debra Haynes. Haynes diagnosed Patterson with PTSD, noting Patterson had a "startle response" and reported waking with nightmares two or three times per week.

In late August 2017 the parties attended a prehearing conference to set a time for a hearing. There Harren confirmed that Patterson no longer believed an SIME was necessary. After scheduling a hearing on a trailing calendar, the parties stipulated to specific deadlines, including filing evidence by December 27, 2017, and attorney's fees affidavits by January 10, 2018.

The District scheduled another medical evaluation in late October 2017 with a different doctor, Dr. Keyhill Sheorn. The written evaluation was not signed by Dr. Sheorn until December 23; it was served on Patterson and filed with the Board on December 26. Dr. Sheorn's evaluation had a new diagnosis: borderline personality disorder with "strong elements of Histrionic Personality Disorder." Dr. Sheorn disagreed with the treatment providers who had treated Patterson over the years for mood disorders. Dr. Sheorn did not think Patterson had PTSD but thought she was malingering and opined that Patterson had no functional limitations preventing her from continuing to work as a nurse. Dr. Sheorn attributed any need for therapy resulting from the incident to Patterson's "maladaptive ways of coping with stress" connected to her "underlying mental illness." Patterson did not ask for either a continuance or an SIME related to Dr. Sheorn's report at that time.

Patterson filed both her hearing exhibits and her attorney's fees affidavit one day late, prompting the District to petition to strike them. After hearing testimony about technological problems at Harren's office, the Board decided it would allow the exhibits' filing, but it refused to accept the attorney's fees affidavit because it determined Harren had a pattern of late filings.

## C. The Board's Hearing On Patterson's Claim

When the hearing began at 11:10 a.m. on the scheduled day, Patterson asked the Board to delay it a day to allow for a full-day hearing. The Board panel was not able to accommodate a one-day delay but agreed to stay an hour late. Patterson was allotted three and a half hours of time, with the District given two and a half hours. No one objected, and Harren indicated that he wished to finish the hearing that day.

Patterson presented several lay witnesses, Dr. Wert, and Haynes, who was still treating her. She also presented testimony from Susan Magestro, whose expert qualifications and testimony were disputed. Dr. Wert testified consistently with his report. The Board chair asked Dr. Wert detailed questions about the various criteria for PTSD, seeking specific examples of how Patterson met those criteria. Dr. Wert testified that he did not think Patterson had a borderline personality disorder.

The District disputed Magestro's qualifications to offer certain opinions. Magestro described herself as a criminologist with a focus on children, teenagers, and family. She had a bachelor's degree in criminology, a master's in teaching, "graduate level certification in severely emotionally disturbed people" and learning disabilities, and "a national dual certification in trauma-sensitive youth." Magestro was an adjunct faculty member at the University of Alaska Anchorage, teaching a training related to the juvenile justice system, when she met Patterson in 2012. Patterson made a presentation that included her recounting of the choking incident for two of Magestro's conferences.

Magestro acknowledged she was not licensed to make a psychological or psychiatric diagnosis. But she testified that she was familiar with the diagnosis of borderline personality disorder because she authored a book about the disorder and had worked in prisons with people "presenting characteristically" with the disorder. The Board declined to permit her to offer her opinion that Patterson did not present as

someone with a borderline personality disorder or her opinion about Patterson's PTSD diagnosis.

The District's only witness was Dr. Sheorn, who had listened to the hearing. Dr. Sheorn's testimony was consistent with her report but also included responses to earlier witnesses' testimony. She gave the opinion that Patterson met few of the eight diagnostic criteria for PTSD. Although she "would not argue" that the deadly choking incident was insufficiently severe to trigger PTSD, she thought Patterson failed to meet most of the other criteria. For example, Dr. Sheorn pointed out that Patterson did not avoid thinking or talking about the incident. Dr. Sheorn explained in broad terms why she thought Patterson had a personality disorder, and she opined that Patterson's counseling needs were related to the personality disorder rather than the choking incident.

At the conclusion of the hearing the Board asked for written closing arguments, identifying several issues for the parties to address. Patterson asked the Board to strike Dr. Sheorn's report due to what she claimed was a prejudicial delay: the District received the initial draft in early November, but it did not serve Patterson with a report until December 26. The Board denied both the request to strike and Patterson's request for a copy of the draft report. During the discussion after the hearing, it became apparent that the parties disagreed about the nature of Patterson's claim; the Board said it would deal with this issue in its decision.

## D. The Board's Decision And The Commission's Affirmance

Ten months later the Board issued a lengthy decision. The Board found that regardless of whether Patterson's mental injury claim was based on the mental stress of the choking incident or her physical exposure to the child's bodily fluids during that incident, she failed to prove that the incident had a sufficient causal connection with the mental health problems for which she sought compensation. The Board gave the most

weight to Dr. Sheorn's opinion that Patterson's counseling needs stemmed from a pre-existing personality disorder, not PTSD.  The Board gave little weight to Dr. Wert's PTSD diagnosis, although it appeared to credit his observations about Patterson's personality traits that it described as "suggestive of borderline personality."  The Board found Patterson's testimony that she loved working as a school nurse and her explanations for why she stopped working not credible.  The Board did not explicitly assign weight to either Dr. Johnson's testimony and opinions or Dr. O'Leary's diagnosis.  The Board denied all of Patterson's claims.

Patterson filed a timely appeal to the Commission.  In early July 2019 Patterson filed a petition for an SIME with the Board along with the necessary SIME paperwork and a motion to stay the Commission appeal due to her SIME petition with the Board.  The Commission stayed the appeal and returned jurisdiction to the Board for consideration of the SIME petition.  After a hearing the Board denied the petition because it was untimely and because the Board did not find an SIME would have been helpful.  Patterson filed an appeal of the SIME denial, which the Commission consolidated with the original appeal.  Patterson's brief to the Commission made numerous arguments, some of which the Commission did not directly address.  The Commission subsequently affirmed both Board decisions.  Patterson now appeals to us.

## III.  STANDARD OF REVIEW

In a workers' compensation appeal from the Commission, we review de novo the Commission's legal conclusion that substantial evidence supports the Board's decision by independently reviewing the evidence and the Board's findings.[3]  We review the Commission's legal conclusions about the Board's exercise of discretion by

---

[3]    *Mitchell v. United Parcel Serv.*, 498 P.3d 1029, 1039 (Alaska 2021) (quoting *Vue v. Walmart Assocs., Inc.*, 475 P.3d 270, 279 (Alaska 2020)).

independently assessing the Board's rulings and applying the appropriate standard of review.[4] "We will find an abuse of discretion when the decision on review is 'arbitrary, capricious, or manifestly unreasonable.' "[5]

## IV.   DISCUSSION

Patterson sought compensation for mental injuries that she alleged stemmed from the choking incident.  The Alaska Workers' Compensation Act requires mental injury claims to be analyzed differently depending on whether the alleged cause of the mental injury is a physical injury or mental stress.[6]  It appears from the record that neither the Board through the prehearing process[7] nor the parties through their pleadings clarified prior to the hearing the type of mental injury claim Patterson was making.  In its decision on the merits, the Board separately applied the analytic steps for each type of claim to the facts of the case.  Patterson's appeal presents arguments related to each type of claim, as well as procedural arguments pertaining to the entire proceeding.

### A.   The Commission Did Not Err By Affirming The Board's Denial Of Patterson's "Physical-Mental" Claim.

When a worker claims that a physical injury has caused a mental condition — a "physical-mental" claim — the claim is analyzed using the presumption analysis generally applicable in workers' compensation cases.[8]  This analysis has three steps.

---

[4]        *Id.* (quoting *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009)).

[5]        *Id.* (quoting *Alaska State Comm'n for Hum. Rts. v. United Physical Therapy*, 484 P.3d 599, 605 (Alaska 2021)).

[6]        *Kelly v. State, Dep't of Corr.*, 218 P.3d 291, 298-99 (Alaska 2009).

[7]        *See* 8 AAC 45.065(a)(1) (designating "identifying and simplifying the issues" as one purpose of a prehearing conference).

[8]        *Runstrom v. Alaska Native Med. Ctr.*, 280 P.3d 567, 572-73 (Alaska 2012); (continued...)

First, the employee attaches a presumption that the claim is compensable by showing some evidence of "a causal link" between the work and the disability or need for medical treatment.[9] Second, the employer may rebut the presumption by presenting substantial evidence that the disability or need for medical treatment was not work related.[10] If the employer does so, then at the third step the Board must weigh the evidence and determine whether employment was, in comparison with other causes of the disability or need for medical care, "the most important or material cause with respect to the benefit sought."[11]

The Board denied Patterson's physical-mental claim at each step of the analysis.[12] The Commission affirmed the Board's decision in most respects. It viewed the result as largely driven by the Board's credibility determinations when weighing the

---

[8]    (...continued)
*see also Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1257 n.36 (Alaska 2007) (observing that Board "properly applied the presumption" analysis when claim "involve[d] mental injury resulting from work-related physical injury").

[9]    *Sumpter v. Fairbanks N. Star Borough Sch. Dist.*, 494 P.3d 505, 514 (Alaska 2021) (quoting AS 23.30.010(a)).

[10]    *Id.*

[11]    *Id.* (quoting *Morrison v. Alaska Interstate Constr. Inc.*, 440 P.3d 224, 238 (Alaska 2019)).

[12]    The Board also concluded that Patterson waived her physical-mental claim because of inadequate notice, and the Commission mentioned the notice issue without analyzing it. The District asserts waiver as a reason to affirm the Commission's decision. We decline to affirm the Commission on this basis because Patterson's initial written claim for benefits included disease exposure as an injury and listed multiple body parts as injured.

evidence at the third step, noting that the Board's credibility determinations are binding on the Commission.[13]

In her opening brief Patterson challenged (1) the Board's determination that she did not attach the presumption of compensability and (2) the Commission's conclusion that substantial evidence supported the Board's decision. In her reply brief Patterson argues for the first time that the District did not rebut the presumption, but she waived that argument by failing to raise it in her opening brief.[14] The District maintains that all of the different legal analyses the Board engaged in were correct.

> **1.    Patterson's exposure to bodily fluids was a sufficient injury to attach the presumption of compensability for a "physical-mental" claim.**

Patterson contends her contact with the child's bodily fluids during her attempts at resuscitation was a physical injury that caused her mental health problems. The Board decided Patterson had not attached the presumption of compensability because the tests for blood-borne illnesses were negative, meaning she "did not sustain an occupational disease or infection" from the exposure. The Commission inaccurately

---

[13]    AS 23.30.128(b) ("The [B]oard's findings regarding the credibility of testimony of a witness before the [B]oard are binding on the [C]ommission."); *see also Sosa de Rosario v. Chenega Lodging*, 297 P.3d 139, 146-47 (Alaska 2013) (construing AS 23.30.128(b)).

[14]    *See Sumpter*, 494 P.3d at 515 (holding that argument raised first in reply brief is waived). The argument has no merit in any event. Both Dr. Sheorn's and Dr. Glass's reports, viewed in isolation without assigning them weight, provided evidence that if believed would eliminate the physical injury alleged here as a cause of Patterson's disability or need for counseling. *See id.* at 516 (summarizing current legal standard for rebutting presumption). Patterson contends her contact with the child's bodily fluids was a physical injury and her mental health concerns grew out of this contact. Both reports diagnosed Patterson with non-work-related mental health disorders, albeit different ones, and both concluded Patterson's pre-existing condition, not exposure to bodily fluids during the choking incident, caused her need for counseling.

stated that the Board accepted her exposure as adequate to attach the presumption and then affirmed what it described as the Board's ruling.

Exposure to bodily fluids can be the basis for a physical-mental claim, even if the claimant does not contract any disease, because the risk of getting sick may cause mental stress. In *Runstrom v. Alaska Native Medical Center* a healthcare worker developed a mental health condition after being splashed in the eye by an HIV-positive patient's blood.[15] She never acquired HIV but she underwent testing for it and received antiretroviral medication.[16] She later made a claim related to a mental health disorder, and we agreed with the Commission that her claim was a physical-mental claim because her mental condition was the result of a physical injury — the eye splash and disease exposure.[17]

We recognized in *Runstrom* that the exposure to bodily fluids itself, which we described as a "physical injury," had a clear link to mental injury: being splashed with blood was "undoubtedly frightening after [Runstrom] realized she had been exposed to a potentially fatal disease."[18] The link between exposure to disease through bodily fluids and mental injury exists here too. Patterson, like Runstrom, was exposed to bodily fluids in a way that necessitated testing for serious diseases. Runstrom was treated with medication pending the outcome of her tests and Patterson was not, but the need for medication was not central to Runstrom's holding. Instead the link was based on fear of contracting a serious disease. In *Runstrom* the risk that exposure to bodily fluids would make the claimant ill may have been greater than in Patterson's case, where there was no

---

[15]    280 P.3d 567, 569-70 (Alaska 2012).

[16]    *Id.*

[17]    *Id.* at 572-73.

[18]    *Id.*

indication that the child to whose bodily fluids she was exposed had any communicable diseases.[19] But for purposes of attaching the presumption of compensability, that difference is not material.

The Board's decision failed to apply *Runstrom* correctly, but the Board alternatively found, after weighing all the evidence, that Patterson's exposure to the child's bodily fluids was not the substantial cause of her mental injury, and the Commission affirmed this finding. Because we decide that the Commission's decision on the merits of this claim was correct, the Board's error about attaching the presumption was harmless.[20]

> **2. The Commission did not err by concluding that substantial evidence supports the Board's determination that Patterson's physical injury was not the substantial cause of her mental health condition.**

After deciding in the alternative that the District rebutted the presumption, the Board weighed the evidence and denied Patterson's claim because it gave most weight to Dr. Sheorn's opinion that Patterson's mental health problems were attributable to her pre-existing mental illness, not to the choking incident. The Commission affirmed, deferring to the Board's determination of witness credibility. Patterson argues that the Board's reliance on Dr. Sheorn's opinion was error largely by contending that Dr. Sheorn was improperly biased.

The Act gives the Board "the sole power to determine the credibility of a witness" and provides that the Board's finding about "the weight to be accorded a

---

[19] *See id.* at 569 (noting that Runstrom's eye was splashed with blood of HIV-positive patient).

[20] *See McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 619 (Alaska 2011) (holding that alternative analyses made error about attaching presumption harmless).

witness's testimony, including medical testimony and reports, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions."[21]  The Board gave the most weight to Dr. Sheorn's diagnosis and opinions, which supported the conclusion that Patterson did not have a work-related mental health condition.  The Board also correctly found that Dr. Wert's opinion did not support the physical-mental claim because he "attributed the [PTSD diagnosis] to [Patterson's] exposure to actual or threatened death," not to her "exposure to the student's bodily fluids."  Because the Commission is bound by the Board's weighing of the evidence, it did not err by concluding that substantial evidence supported the Board's decision to reject the physical-mental claim.

**B.    The Commission Did Not Err By Affirming Denial of Patterson's "Mental-Mental" Claim.**

The Act establishes a distinct framework for compensation for mental injuries allegedly caused by work-related mental stress, also called "mental-mental" claims.[22]  Under AS 23.30.010(b), workers' compensation is  "not payable for mental injury caused by mental stress, unless it is established that (1) the work stress was extraordinary and unusual in comparison to pressures and tensions experienced by individuals in a comparable work environment; and (2) the work stress was the predominant cause of the mental injury."[23]

The Board denied Patterson's mental-mental claim on both grounds, finding that the stress of the choking incident was not "extraordinary and unusual" and that the

---

[21]    AS 23.30.122.

[22]    *Kelly v. State, Dep't of Corr.*, 218 P.3d 291, 298 (Alaska 2009).

[23]    The statute also provides that the amount of stress must "be measured by actual events," and a mental injury is not compensable if it "results from a disciplinary action, work evaluation, job transfer, layoff, demotion, termination, or similar action taken in good faith by the employer."  AS 23.30.010(b).

stress was not the predominant cause of her mental health condition. The Commission affirmed both of these rulings. Although the agencies' analysis misapplies our precedent on mental stress — which the District does not defend — we affirm the denial of Patterson's mental-mental claim because the Commission did not err by concluding that substantial evidence supports the Board's finding that stress from the choking incident was not the predominant cause of Patterson's mental injury.

> **1.     The agencies erred in analyzing Patterson's claim of mental stress by failing to consider particular details about the severity of the incident.**

In *Kelly v. State, Department of Corrections* we reversed the rejection of a mental-mental claim brought by a prison guard.[24] The guard was unarmed and locked in a prison module with inmates suffering from mental health conditions when an inmate whom the guard had previously disciplined approached with a sharpened pencil and threatened to stab the guard in the eyes and then kill him.[25] The guard reported that he was afraid to provoke the inmate by calling for help, so he remained in the standoff until other officers, noticing that he was not answering his radio, came to investigate.[26]

The Board denied the guard's mental-mental claim, finding the stress he experienced was not unusual and extraordinary. The Board reasoned that it was not unusual for prison guards to be threatened by inmates, relying on testimony by another

---

[24]     218 P.3d at 293, 298.

[25]     *Id.* at 293.

[26]     *Id.* at 293-94.

guard describing routine threats against him even though those threats had not appeared "viable" to that guard.[27]  The Commission affirmed.[28]

We reversed because the agencies' analysis of the claimant's stress was too generalized:  "An examination of [the other guard's] testimony shows that while he had experienced threats, they were of a different quality and character from the death threat incident that Kelly described."[29]  The failure to consider the particular facts of the incident in evaluating the degree of mental stress required reversal.[30]  We made it clear that the Board must consider the particular facts and key details to determine whether the stress related to an incident is extraordinary and unusual.

The Board's and Commission's decisions in this case essentially make the same mistake as in *Kelly* by considering the choking incident at a high level of generality, without attention to key details.  The Board focused on the need for school nurses to respond to emergencies and the frequency of choking in elementary schools.  The Board also noted evidence that, in the year following the choking incident, Patterson was involved in two more emergencies.  It therefore concluded that emergencies were common enough in her line of work that the choking incident underlying her claim could not be considered extraordinarily or unusually stressful.

Neither the Board nor the Commission considered the quality and character of the specific choking event that underlay Patterson's claim.  Just as not all threats to prison guards are equally stressful, not all emergency care in an elementary school is equally stressful.  The September 2014 incident involved a child who was turning blue

---

[27]     *Id.* at 296.

[28]     *Id.* at 296-97.

[29]     *Id.* at 301.

[30]     *Id.* at 301-02.

by the time Patterson was able to attend to him, lost his pulse multiple times during her efforts to revive him, required emergency transport to the hospital, and later died. The Board discussed none of these factors when evaluating whether Patterson's stress could be extraordinary and unusual in comparison to the stress commonly experienced by school nurses.

The Board also failed to acknowledge evidence in the record highlighting the severity of the incident. It mentioned one part of Dr. Glass's report, apparently considering his statement that "aspiration crises with small children" were not "extraordinary or unusual," while failing to mention his acknowledgment that the "tragedy in September could be considered unusual — fortunately not a common occurrence" and that "the event [was] emotionally traumatic." Nor did the Board mention Dr. Sheorn's concession that the incident could have been severe enough to trigger PTSD[31] or the testimony of Dr. Johnson, the only medical provider who testified from personal experience about the effect of a young patient's death, that the incident was "extremely unusual" and would require counseling.

As for the other examples of emergency care by Patterson that the Board highlighted, neither of those incidents involved a person's death, nor was Patterson so intimately involved in providing care. The outcome of a later choking incident was that the child's teacher "did abdominal thrusts and cleared" the obstruction while Patterson "sprinted" to the classroom, so Patterson did not provide emergency care herself. During a staff member's collapse, Patterson was "ready to use the [defibrillator] and begin CPR" but again was not actually required to provide emergency care.

---

[31]     As set out in Dr. Sheorn's report, this criterion requires that the person be "exposed to: death, threatened death, [or] actual or threatened serious injury" by, among other things, witnessing it in person.

Finally, the Board's attempt to distinguish *Kelly*, which the Commission approved, is misplaced. The Board distinguished *Kelly* by noting that the guard had been "subjected to a traumatic death threat," whereas Patterson "was not threatened." But mental stress can result from many different situations, not just situations in which the claimant is threatened by another person. Our decision in *Kelly* certainly did not imply that mental-mental claims are compensable only if they arise out of being threatened.

All told, the agencies' legal analysis of whether Patterson's work stress was sufficiently extraordinary and unusual to support a mental-mental claim was erroneous in light of our decision in *Kelly*.[32]

> **2.    The Commission did not err by determining that substantial evidence supported the Board's finding that the mental stress of the choking incident was not the predominant cause of Patterson's mental injury.**

The agencies' error in considering whether the stress Patterson experienced was extraordinary and unusual is troubling but ultimately harmless because substantial evidence supports the Board's alternative conclusion that the stress was not the predominant cause of Patterson's mental injury,[33] which the Commission affirmed. Patterson argues that the Board erred in relying on Dr. Sheorn's report and testimony, citing research about Dr. Sheorn's testimony in other cases.

---

[32]    The Commission's decision cites *Kelly* as saying that the employee's "perception that she feels stress is inadequate to establish extraordinary and unusual stress." In *Kelly* we held that "a worker's perception that he feels stress is *by itself* inadequate to establish" that level of stress. 218 P.3d at 299-300 (emphasis added). We also held that an employee's perception of the events underlying the claim could be considered when deciding whether the stress was extraordinary and unusual. *Id.*

[33]    *McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 619 (Alaska 2011) (holding that Board error in deciding that claimant did not attach presumption was harmless because Board did alternative analysis assuming presumption attached).

As explained above, the Board has the sole authority to weigh evidence and determine credibility,[34] and the Commission is bound by those determinations.[35] The Board evidently was not persuaded by Patterson's assertion that Dr. Sheorn had a bias that made her opinions unreliable, and neither the Commission nor this court has authority to second-guess the Board on that point.[36] Therefore the Commission did not err by affirming the Board's denial of Patterson's mental-mental claim.

### C. The Commission Did Not Err By Affirming The Board's Denial Of A Second Independent Medical Evaluation.

Patterson asked the Board to order a second independent medical evaluation (SIME) months after the Board had issued a final decision in her case, while it was on appeal to the Commission. The Commission stayed the appeal and returned the case to the Board so the Board could consider the petition. The Board denied the petition, concluding that under its regulations the request was untimely and that an SIME would not have been helpful in any event. The Commission affirmed the Board's decision.

On appeal Patterson argues, as she did in the Commission, that the Board's failure to order an SIME violated her due process rights.[37] She maintains that an SIME was required to counter Dr. Sheorn's report, which she considers "very biased." But she

---

[34] AS 23.30.122.

[35] AS 23.30.128(b).

[36] *Cf. Weaver v. ASRC Fed. Holding Co.*, 464 P.3d 1242, 1254, 1257 (Alaska 2020) (affirming decision that gave more weight to an expert whom the Board had found not credible in other cases because of Board's authority to weigh evidence).

[37] The Commission did not discuss Patterson's due process claim.

fails to develop a legal argument why due process limits the Board's discretion to reject such a late SIME request and thus has waived that claim.[38]

The statutory language of AS 23.30.095(k), the subsection authorizing SIMEs, indicates that the Board has discretion to order an SIME.[39] The Board's regulations allow a party to request an SIME within 60 days of receiving a medical report that raises a factual dispute; failure to comply with that deadline waives a party's right to request an SIME.[40]

Patterson did not request an SIME based on the difference between her physicians' opinions and Dr. Sheorn's opinion until July 2019, more than eight months after the Board's final decision on her claim in October 2018, more than 17 months after the January 2018 hearing on her claim, and more than 18 months after she first received Dr. Sheorn's report in December 2017. She has never explained the reason for the long delay. In light of this delay, the Board did not abuse its discretion when it denied her petition for an SIME.

---

[38] *See AT & T Alascom v. Orchitt*, 161 P.3d 1232, 1247 (Alaska 2007) (refusing to consider legal claim because of inadequate briefing).

[39] The statute provides in part, "In the event of a medical dispute . . . the [B]oard may require that a second independent medical evaluation be conducted . . . ." AS 23.30.095(k); *see also Tobar v. Remington Holdings LP*, 447 P.3d 747, 757 (Alaska 2019) ("[A]n SIME is discretionary . . . .").

[40] 8 AAC 45.092(g)(2).

**D. The Board Did Not Err By Sustaining Objections To Parts Of Susan Magestro's Testimony.[41]**

Patterson argues that the Board erred by excluding testimony that she tried to elicit from Susan Magestro about Patterson's psychological diagnoses. Relying on cases about scientific evidence,[42] Patterson contends Magestro had the necessary qualifications to contradict Dr. Sheorn's diagnosis. Patterson cites Magestro's testimony — possibly made as an offer of proof at a different hearing — that in her professional opinion Patterson did not "present" as having a borderline personality disorder, as Dr. Sheorn had diagnosed. The District maintains the Board properly exercised its discretion in sustaining the District's objections to Magestro's testimony about Patterson's condition.

Patterson's legal argument is somewhat unclear, but we understand her to argue that the Board's reliance on Magestro's admitted lack of medical or psychological training was error because the Board ignored the expertise she had acquired through her work experience. Experts can acquire expertise through experience as well as

---

[41] We review the Commission's decision in a workers' compensation appeal rather than the Board's, *Mitchell v. United Parcel Serv.*, 498 P.3d 1029, 1039 (Alaska 2021). Here the Commission summarized Magestro's training and her lack of certain professional qualifications, but it did not discuss Patterson's argument that the Board should have allowed Magestro to offer an opinion about Patterson's diagnoses. In her brief to us, Patterson contends the Board erred in refusing to allow part of Magestro's testimony. The applicable standard of review requires us to independently assess the Board's actions, *id.*, so we address directly Patterson's argument.

[42] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *State v. Coon*, 974 P.2d 386 (Alaska 1999), *abrogated on other grounds by State v. Sharpe*, 435 P.3d 887 (Alaska 2019).

education.[43] But it is not clear how Magestro's testimony about Patterson's presentation was relevant to the issues before the Board. Patterson's mental health diagnosis was a contested issue, and Magestro clearly conceded she was not qualified to make such a diagnosis. We see no error or abuse of discretion in the Board's decision not to allow Magestro to express the expert opinion Patterson sought to counter Dr. Sheorn's diagnosis.

Moreover, Patterson does not show how exclusion of this testimony was prejudicial. Patterson presented the opinions of several medical experts who *were* qualified to make psychological diagnoses and who agreed she had PTSD, yet the Board gave more weight to Dr. Sheorn's opinion that Patterson did not have PTSD. We therefore fail to see how excluding Magestro's testimony was prejudicial.

### E. Patterson's Remaining Arguments Are Waived Or Moot.

Patterson's challenge to the Board's exclusion of her attorney's fees affidavit is moot because we affirm the Commission's decision on the merits of Patterson's compensation claim.[44] An employee's attorney's fees in workers' compensation Board proceedings are awarded only when she prevails on the claim;[45] Patterson did not prevail, so she would not be entitled to relief even if the fee affidavit had been timely filed.

---

[43] Alaska R. Evid. 702(a) (permitting a "witness qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony).

[44] *See Bridges v. Banner Health*, 201 P.3d 484, 490 (Alaska 2008) (setting out when an issue is moot).

[45] *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 895 (Alaska 1991) (construing AS 23.30.145(b) as requiring that employee "be successful on the claim itself").

Patterson's inadequate briefing to us[46] waived her claims that (1) the Board failed to provide her a fair opportunity to cross-examine Dr. Sheorn;[47] (2) the Board failed to consider her aggravation claim; and (3) the Board failed to declare a "mistrial" or reopen the record to allow her the opportunity to present additional evidence.

## V. CONCLUSION

We AFFIRM the Commission's decision.

---

[46] Patterson made these arguments to the Commission, but the Commission did not address them. We summarize the arguments as Patterson framed them in her briefing to us.

[47] Additionally, Patterson waived this argument by acquiescing to the Board's time allotment proposal at the outset of the hearing. *See Williams v. Abood*, 53 P.3d 134, 148 (Alaska 2002) ("[F]ailure to make the appropriate objection during the hearing waives the right to appeal procedural errors.").